**Oneita Faye Foster POTTER, and Waller Theopholious Potter, Jr., as natural guardians for Carrie Layne Potter, a child, Petitioners,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–2V.

United States Claims Court.

March 25, 1991.

---

Gary L. Shockey, Jackson, Wyo., for petitioners.

Carol B. Essrick, Washington, D.C., with whom was Asst. Atty. Gen., Stuart M. Gerson, for respondent.

## OPINION

NETTESHEIM, Judge.

Oneita Faye Foster Potter and Waller Theopholious Potter, Jr. ("petitioners"), as natural guardians for Carrie Layne Potter, a child, sought compensation under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1—300aa–34 (Supp. V 1987), *as amended* by several public laws codified in 42 U.S.C.A. §§ 300aa–1—300aa–34 (West Supp.1990), and the Vaccine and Immunization Amendments of 1990, Pub.L. No. 101–502 (1990) ("the Act"). This case is before the court after argument on respondent's single objection to a special master's award of a contingency fund in the amount of $50,-000.00.

### FACTS

The following facts are undisputed.[1] Carrie Layne Potter was born March 30, 1984, at the Elizabeth Knutsson Memorial Hospital in Estes Park, Colorado. On June 5, 1984, she was taken to the office of Dr. Phil McClain, in Estes Park for a regular checkup. Dr. McClain declared Carrie a normal healthy baby and sent her to the Larimer County Health Department for her first DPT vaccination. On September 5, 1984, Mrs. Potter took Carrie back to the Health Department for her second DPT vaccination. That evening Carrie ran a fever and cried loudly most of the night. On September 6 she vomited and had high-pitched screaming. Mrs. Potter noticed that the child's eyes were rolling back in her head and that she was throwing her arms and legs out to the side. Over the following week, Carrie continued to have seizure activity four or five times a day. On September 7, 1984, Mrs. Potter telephoned Dr. McClain, who advised continued monitoring of the condition. After examining Carrie on September 14, 1984, Dr. McClain diagnosed an ear infection, changed her formula, and prescribed amoxicyllin. Dr. McClain checked Carrie again on September 17 after the seizure activity continued unabated. After witnessing this activity, Dr. McClain sent Carrie to the Northern Colorado Medical Center for tests, noting that she may have been experiencing a DPT reaction or biochemical infection.

On September 18, 1984, Carrie was hospitalized for three days with a seizure disorder. As a result she was placed on phenobarbital liquid twice a day. Carrie has been hospitalized since then both as an in- and out-patient on several occasions. Because of her seizures, mixed seizure disorders, retardation and behavioral disorders, Carrie is considered multiply handicapped. At the age of 5 she had the motor and self-help skills of a baby 18 months old and cognitive skills of age 8 months. Carrie was placed in the MESA Developmental Services Group Home on October 7, 1988.

---

1. The parties agree that this decision does not contain any material subject to 42 U.S.C.A.

§ 300aa–12. The Clerk of the Court may release the opinion without delay.

On January 2, 1990, petitioners filed their petition seeking compensation for a vaccine-related injury. On December 18, 1990, Special Master Paul T. Baird filed a decision finding that Carrie had suffered an encephalopathy under the circumstances that the Act covers and awarding petitioners an annuity for the remainder of Carrie's life. He also awarded a contingency fund in the amount of $50,000.00:

> 12. Contingency Fund.[10]
>
> The sum of $50,000 is allowed to compensate for the likelihood of excess inflation in the next few years and to provide a reserve fund for unforeseen contingencies.
>
> A summary of the items for compensation provided for herein is set out in Appendix A hereto.

> [10] This item was not addressed by petitioners, but is considered by the court to be an appropriate element of compensation considering that the bulk of the award will be used to purchase an annuity with a fixed growth rate.

*Potter v. Secretary*, No. 90–2V, slip op. at 8 & n. 10 (Cl.Ct.Spec.Master Dec. 18, 1990). In Attachment A to his opinion, the special master qualified the annuity with the following proviso: "[F]rom the first annual installment payment of the award, $137,348 should be paid directly to petitioners, $87,-348 to cover the first year's expenses and $50,000.00 as a reserve fund to cover excess inflation in the early years and as a contingency fund." In recommending an annuity, the special master noted that a cost escalator in the annuity was necessary as an allowance for inflation. He observed that the 4–percent figure was the one most commonly used by special masters.[2] Respondent challenges the award of the contingency fund.

## DISCUSSION

### 1. *Standard of review*

On review of a decision by a special master, the Claims Court is authorized to "set aside any findings of fact or conclu-

> 2. Respondent accepts the factual underpinning of the 4–percent rate and does not object to it. *But see Meyer v. Secretary*, No. 89–68V, 1991 WL 27428 (Cl.Ct. Jan. 2, 1991) (remand to determine

sion[s] of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law." 42 U.S.C.A. § 300aa–12(e)(2)(B).

The Supreme Court, in the context of reviewing a federal agency's decision under the Administrative Procedure Act, 5 U.S.C. § 706 (1988), explained that under the arbitrary and capricious standard a reviewing court must consider "whether the [federal agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) (citing cases). "Although ... [the] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Id.*

The Federal Circuit, in the context of reviewing a district court's decision to quash a deposition subpoena, gave the following guidelines:

> An abuse of discretion occurs when (1) the court's decision is "clearly unreasonable, arbitrary or fanciful" (*Northrop Corp. [v. McDonnell Douglas Corp.]*, 751 F.2d [395] at 399) [D.C.Cir.1984]; (2) the decision is based on an erroneous conclusion of law (*Ariel [v. Jones]*, 693 F.2d [1058] at 1060 [11th Cir.1982], citing *Premium Service Corp. [v. Sperry & Hutchinson Co.]*, 511 F.2d [225] at 229) [9th Cir.1975], (3) the court's findings are clearly erroneous (*Deitchman [v. E.R. Squibb & Sons, Inc.]*, 740 F.2d [556] at 564 [7th Cir.1984]); or (4) the record contains no evidence on which the district court rationally could have based its decision (*e.g., Ariel*, 693 F.2d at 1060). However, "[t]he phrase [abuse of discretion] means ... that the court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." *Kern v. TXO Production Corp.*, 738 F.2d 968, 970 (8th Cir.1984);

proper discount rate when special master used 2 percent based, *inter alia*, on the adoption of this rate by other special masters).

*Dart Industries Co. [v. Westwood Chemical Co., Inc.],* 649 F.2d [646] at 648 [9th Cir.1980], citing *Premium Services Corp.,* 511 F.2d at 229.... "Such abuses ... [of discretion] must be unusual and exceptional; we will not substitute our judgment for that of the trial judge." 511 F.2d at 229 (citation omitted).

*Heat & Control Inc. v. Hester Indus., Inc.,* 785 F.2d 1017, 1022 (Fed.Cir.1986); *see also Hyundai Electronics Indus. Co. v. ITC,* 899 F.2d 1204, 1209 (Fed.Cir.1990) (explaining that the "touchstone" of arbitrary, capricious, and abuse of discretion standards of review is rationality—consideration of all relevant factors absent a clear error of judgment).

### 2. *Review of special master's factual and legal conclusions*

As the facts of the case are undisputed, the court must only review the special master's legal conclusion that Carrie is entitled to a $50,000.00 contingency fund. The special master awarded this amount "[t]o compensate for the likelihood of excess inflation in the next few years and to provide a fund for unforeseen contingencies." *Potter,* No. 90–2V, slip op. at 8. Such a fund was necessary because "[t]he bulk of the [total] amount ... will be used to purchase an annuity with a fixed growth rate." *Id.* at 8 n. 10. The gravamen of respondent's objection to the special master's decision awarding a contingency fund is that such compensation is neither authorized by the Act nor by case law.

42 U.S.C. § 300aa–15(a)(1)(A) provides, in pertinent part:

Compensation awarded under the Program ... shall include the following:

(1)(a) Actual unreimbursable expenses incurred from the date of the judgment awarding such expenses and *reasonable projected* unreimbursable expenses which

(i) result from the vaccine-related injury for which the petitioner seeks compensation,

(ii) *have been or will be* incurred by or on behalf of the person who suffered such injury, and

(iii)(I) *have been or will be* for diagnosis and medical or other remedial care determined to be reasonably necessary, or

(II) *have been or will be* for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

(Emphasis added.) This provision is an exhaustive list of the compensatory expenses allowable under the Act. Furthermore, the statute mandates factual certainty that these expenses "have been or will be necessary" for enumerated specific expenses often incurred in treatment of vaccine-related injuries. There is little room, therefore, for compensation based on uncertain future expenses.

In *Hulsey v. Secretary,* 19 Cl.Ct. 331 (1990), the court stated that a judge must carefully review compensation categories to determine if such expenses are authorized by the Act. 19 Cl.Ct. at 333–34. In *Hulsey* the special master had allowed compensation for "fiduciary services" by classifying such services as "case management services," which are specifically provided for in the Act. *Id.* at 334. The Claims Court disallowed the fiduciary expenses reasoning that "Congress could have provided a statutory framework permitting compensation for such services, but it did not do so, and this court cannot do so in its place." *Id.* Absent a clear congressional mandate in the statute to allow specified compensated services, the court is not able to sustain a decision by a special master awarding them.

No provision in the Act contemplates the award of a contingency fund. If Congress chose not to include such an award in the statutory scheme, the Claims Court is without authority to ignore the legislative scheme and to let the award stand. *Hulsey,* 19 Cl.Ct. at 334. This is especially true when a court creates an entirely new

compensation category, rather than attempting to justify the award on the basis of enumerated expenses in the statute. In any case, "the Act itself enumerates the only types of services for which compensation may be granted." *Id.* Congress listed over ten types of unreimbursed future expenses frequently incurred in vaccine injury cases. A contingency fund for excess inflation is not an included expense, and, therefore, no legal basis for an award of a contingency fund is present in the Act.

Aside from a legal basis for awarding compensation, the special master must articulate an evidentiary basis for award of compensation that is "sufficient to allow review of the special master's decision." RUSCC App. J. ¶ 3(b).

In the instant case, the special master *sua sponte* awarded petitioners a $50,-000.00 contingency fund to provide for near-term inflation over and above the interest on the bulk annuity to be purchased for Carrie by respondents. The fund was also to provide for unforeseen contingencies. The special master gave no other explanation for the award and, indeed, acknowledged that petitioners had not requested such relief. *Potter,* slip op. at 8 n. 10. However, expenses must either be documented [actual] or "reasonably projected." *Hulsey,* 19 Cl.Ct. at 334. Without an evidentiary basis for an award, no "reasonably projected" expenses are allowable under the Act.

Petitioners were persuaded not to lodge an objection to the special master's decision due to inclusion of the $50,000.00 contingency fund. In their view the special master had given the minimum amounts requested, so that only with the contingency fund did petitioners deem the compensation adequate. For example, petitioners requested a medical fund to accumulate $8,450.00 per year for Carrie's future medical costs. The special master allowed $2,000.00, noting that the amount requested was based on the average cost of Medicaid patients, not on Carrie's own projected costs, and that no evidence was offered on point. *Potter,* slip op. at 6. On review petitioners do not make any show-

ing that the finding was unsupported, nor do they attempt to show that any other determinations underlying the award's components were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Consequently, the court has no basis to conclude that the contingency fund augments an inadequate annuity.

Regarding the inflation factor, petitioners contend that the record before the special master included a report by economist Dr. James Everson, which includes an analysis of the historical rate of inflation in the United States. He identified a rate of 5.30–6.30 percent per year since World War II. Petitioners agree that the 4–percent rate likely will be sufficient, as it compounds in the future. Nonetheless, they argue, in the short term, 4 percent is inadequate, so that the special master's solution to offset near-term inflation by a lump-sum benefit is reasonable. "This is more practical than to try to obtain an annuity which increases at the rate of 5 or 6 percent per year for the first few years of the annuity, then dropping off to 4% later." Pets' Br. filed Feb. 15, 1991, at 3.

This court recognizes that inflation may reduce the size of petitioners' overall award. Such an eventuality is one motivation behind respondent's purchase of an annuity. However, the special master did not cite to any economic or other data indicating the likelihood that inflation is or would remain above 4 percent. In his decision the special master stated:

> When using an annuity, it is necessary to predict future inflation in order to build in a cost escalator so that future payments will be sufficient to meet the projected future cost of the needs of which compensation is being awarded. A 4% cost escalator has been the figure most commonly used by special masters in cases brought under the Program and is considered to be a reasonable figure to use in this case.

*Potter,* slip op. at 10 (footnote omitted). This indicates that a 4–percent inflation rate is reasonable and calls into question whether any supplemental compensation is

necessary. If a higher inflation rate is likely (based on economic data and forecasts), then an annuity with a higher rate should have been recommended. When the record is devoid of a factual, let alone legal, basis for a compensation award, the court cannot approve the compensation.

The court concludes that the Act contemplates a specific award of an annuity or lump-sum and does not contemplate a contingency fund to embody an element of either type of award. Therefore, a remand to determine what part of the $50,000.00 contingency fund is allocable to near-term inflation would be inappropriate.

### CONCLUSION

Based on the foregoing, that part of the special master's decision granting petitioners a $50,000.00 contingency fund is set aside. The decision is otherwise sustained. Paragraph 2 on page 11 of the special master's decision shall be modified to read:

2. The award of compensation shall be that which is required to enable respondent to pay a lump sum to petitioners from the first installment of $87,-348.00 to cover the first year's expenses and to purchase a life only annuity with a 4% annual cost escalator to provide the benefits allowed hereinabove.

The Clerk of the Court shall enter judgment in accordance with the special master's decision as modified.

IT IS SO ORDERED.

No costs on review.