**Jane Marie SCHWENK, Petitioner,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–44V.

United States Claims Court.

June 4, 1991.

---

Walter S. Kyle, Boston, Mass., atty. of record, for petitioner.

David L. Terzian, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## ORDER

HARKINS, Senior Judge:

Petitioner, Jane Marie Schwenk, and respondent, the Secretary of the Department of Health and Human Services, each seek review in the United States Claims Court under the National Vaccine Injury Compensation Program (the Program) of a decision dated March 12, 1991, by Special Master Elizabeth E. Wright. 42 U.S.C.A. § 300aa–12(e) (West Supp. 1991). The Program was established in 1986 as part of the

National Childhood Vaccine Injury Act, Pub.L.No. 99–660, Title III, § 311(a), 100 Stat. 3758. In a series of amendments, procedures applicable to the functions of special masters, and review of decisions of special masters, have been changed substantially. Amendments to the Program were made in the Omnibus Budget Reconciliation Act of 1987 (1987 Amendments), Pub.L.No. 100–203, Title IV, 101 Stat. 1330–222 (Dec. 22, 1987); the Medicare Catastrophic Coverage Act of 1988, Pub.L.No. 100–360, Title IV, 102 Stat. 808 (July 1, 1988); the Omnibus Budget Reconciliation Act of 1989 (1989 Amendments), Pub.L.No. 101–239, Title VI, § 6601, 103 Stat. 2285–94 (Dec. 19, 1989) and the Vaccine and Immunization Amendments of 1990 (1990 Amendments), Pub.L.No. 101–502, § 5, 104 Stat. 1286 (Nov. 3, 1990). Provisions governing the Program are contained in 42 U.S.C.A. §§ 300aa–10 through 300aa–34 (West Supp. 1991). For convenience, further reference to the Program in this order will be to the relevant subsection of "42 U.S.C.A. § 300aa–___."

Jane Marie Schwenk was a normal and healthy baby when born on July 24, 1968. She received her first DTP (diphtheria-tetanus-pertussis) vaccination on September 25, 1968, a second DTP vaccination on November 2, 1968, and a third DTP vaccination on January 7, 1969. On January 7, 1969, reactions began to be observed, and by January 31, 1969, her condition was diagnosed as "convulsive disorder cause undetermined." The special master in this proceeding determined she has a vaccine-related partial complex seizure disorder that is entitled to compensation under the Program.

Petitioner's seizures typically occur during the day, and are most notably associated with ovulation, menstruation and stress. She currently experiences complex partial seizures on the average of one to three times per month. The seizures last approximately one half hour, and she must lie down and rest for a period of up to 2 hours following a seizure. For about 5 minutes prior to most seizures, she is aware that one is coming on. For the seizure disorder, she takes 9 pills (1800 mg. total) of Tegre-

tol per day. This need will continue for her lifetime.

At the time of the special master's decision, the petitioner was 22 years old. Petitioner was a senior at the University of Evansville, in Evansville, Indiana, scheduled to graduate in May 1991. Her major was in business administration, with a concentration in finance, and her vocational goal was to work in bank management or to become a financial analyst.

Petitioner lives in an apartment with three roommates. She is able to grocery shop, cook, clean and organize and perform all the required activities of daily living. She also has a healthy social life, and goes out with friends or with her boyfriend. She does not have a driver's license because of her seizure disorder. She currently works 10 hours a week at minimum wage as a secretary in the graduate studies office. She has held part time jobs throughout her college career and full time summer jobs.

In the March 12, 1991, decision, the special master concluded that petitioner satisfied the requirements for entitlement to compensation under the Program. The decision provides for an award of compensation, in the form of an annuity, to cover designated expenses for the remainder of her life.

In their objections to the special master's decision, neither the petitioner nor the respondent requested review of the basic entitlement decision. Petitioner challenges the denial of an award for health care insurance, and contends the special master abused her discretion by assuming, in the absence of substantive proof, that petitioner in fact will obtain and maintain a position in a company with a group health policy which would cover vaccine-related future medical costs. Petitioner also contends that the decision was an abuse of discretion in that it forces petitioner to obtain employment in Indiana, with a company that offers group medical coverage, thereby restricting her freedom to select a job of her choice.

Respondent does not seek review of that portion of the special master's decision con-

cerning the types and amounts of compensation to be awarded in the form of an annuity. Respondent, challenges, as an error of fact and in law, an award of $10,000 to be provided through the annuity in the first year. Respondent argues that this award is a prohibited "contingency fund."

The responsibilities and functions of special masters in the Program's amended procedures are unique. The 1989 Amendments established a separate office of special masters within the Claims Court, administered by a chief special master, and gave that office special authority and considerable administrative independence in decisions on claims for compensation under the Program. Section 12(c). The 1989 Amendments directed promulgation of separate rules for special masters, and established specific criteria the rules were to contain (Section 12(d)(2)). Standards were established for conduct of proceedings on a petition (Section 12(d)(3)(B)). Review of a special master's decision by the Claims Court is expected to be an exceptional occurrence rather than a routine procedure.

■ A special master's decision may not be disturbed by the Claims Court unless the court finds it to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. The 1989 Amendments defined the Claims Court function in a review of a special master's decision in Section 12(e)(2), as follows:

> (2) Upon the filing of a motion under paragraph (1) with respect to a petition, the United States Claims Court shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter—
>
> (A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,
>
> (B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

> (C) remand the petition to the special master for further action in accordance with the court's direction.

The report of the Conference Committee on the 1989 Amendments emphasized that an appeal to the Claims Court was to be "under very limited circumstances." The report states:

> The Conferees have provided for a limited standard for appeal from the master's decision and do not intend that this procedure be used frequently but rather in those cases in which a truly arbitrary decision has been made.

H.R.Conf.Rep.No. 386, 101st Cong., 1st Sess., at 517, *reprinted in* 1989 U.S. Code Cong. & Admin. News 1906, 3112, 3120.

■ This limited scope of review is tailored to the concepts and objectives of the Program. The standard "arbitrary, capricious, an abuse of discretion or otherwise in accordance with law" is based on one of the criteria established by the Administrative Procedure Act (APA). 5 U.S.C. § 706 (1988). To the extent consistent with Program objectives to be attained through the Office of Special Masters, decisions interpreting the APA standard have application in a review of a special master's decision.

Under the APA standard, conclusions of law are considered de novo. *Rice v. Wilcox*, 630 F.2d 586, 589 (8th Cir.1980). On issues of law under the Program, recognition is to be given to the special master's expertise in the development of these novel procedures. A decision on issues of law applicable to the Program should be overturned only when error is unmistakenly clear.

■ When the Claims Court reviews a special master's decision, the court is required to engage in a searching and thorough review, but the scope of the inquiry is limited. The Claims Court may not substitute its own judgment for that of the special master. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971). The special master's decision must articulate a rational connection between the facts found and the choice made. *Burlington Truck Lines, Inc. v. United States,*

371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). "Arbitrary and capricious" includes decisions where the special master has relied on factors which Congress has not intended to be considered, or has entirely failed to consider an important aspect of the problem, or has offered an explanation of the decision that runs counter to the evidence, or is so implausible it could not be ascribed to a difference in view or a product of expertise. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). The touchstone for the arbitrary and capricious standard is rationality; if the relevant factors have been considered, and no clear error of judgment has been made, the decision should be affirmed. *Hyundai Electronics Industries v. United States International Trade Commission*, 899 F.2d 1204, 1209 (Fed.Cir.1990). Where there is conflicting evidence, appropriate deference is given the special master's findings of fact. *Hambsch v. Department of Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986). The party challenging the decision has the burden of proving it was arbitrary and capricious. *de Cisco v. United States*, 677 F.2d 66, 71–72, 230 Ct.Cl. 224 (1982).

In the decision, the special master evaluated the requests for compensation detailed in a life care plan compiled by petitioner's witness, and an alternative life care plan compiled by respondent's witness. The special master considered and ruled upon all of petitioner's requests for compensation: future medications, neurologic examinations, diagnostic testing, job placement counseling, companion care, and insurance coverage.

The special master concluded that medication would cost $755.55 yearly, and the expense would continue throughout petitioner's lifetime. Provision was made for two visits per year at a cost of $55 per visit to a neurologist for medical treatment throughout her lifetime, plus a $30 transportation allowance, starting in 1994, when she was expected to be employed. Diagnostic testing that was allowed included one liver function (SGOT) per year at $28 per test and two blood level tests per year

at a cost of $44 per test. The special master denied petitioner's request for health insurance costs, job placement counseling services, and costs for the services of a companion.

In order to comply with the criteria in Section 15(a)(1)(A) (that allows compensation for "reasonable projected unreimbursable expenses"), and the prohibition in Section 15(g) (that precludes compensation to the extent payment can "reasonably be expected" to be made under an insurance policy or under a federal or state health benefit program), the special master adjusted the award to account for projected future costs. The special master found it reasonable to assume it would take petitioner one year to find employment following her graduation from college, and that any group policy under which she may subsequently be covered may exclude, as preexisting, her condition for a period of one year following her employment. The special master found it reasonable to compensate her in full for expected medical expenses relating to her seizure disorder for a 2–year period after graduation from college, and after that to assume that she will be responsible for a 20% co-payment for covered medical expenses up to age 65; and after she reaches age 65, to assume that she will be eligible for Medicare, which also requires a 20% co-payment for covered expenses. These assumptions were factored into the special master's calculations to provide a total payment for medical care, medical tests and medication in 1991 through 1993 of $981.55, for the period 1994–2033, an annual payment of $226.31, and for the balance of her life after 2033, an annual payment of $830.75. The annuity is to include a 5 percent inflation factor compounded annually.

The decision of the special master also includes the following item of compensation:

*One-time Up–Front Allotment*

Although not requested, a one-time, up-front, allotment of $10,000 will be provided for through the annuity in the first year.* Based on the court's experience, this allotment is a reasonable amount to

cover any unexpected occurrences or unplanned expenditures such as fluctuations in the interest rates, unexpected hospitalizations or other medical costs incurred during any period during which Jane Marie may not be insured.

* (Footnote omitted.)

■ Respondent contends that the $10,000 allotment in the first year is a "contingency fund" which, in addition to not being requested by the petitioner, has no legal or evidentiary basis. Respondent cites *Potter v. Secretary of HHS*, 22 Cl.Ct. 701 (1991) (naked "contingency fund" not authorized) and *Hulsey v. Secretary of HHS*, 19 Cl.Ct. 331 (1990) (unauthorized "fiduciary services" may not become authorized by classifying as "case management services") to support the contention that the special master's $10,000 one-time allotment is not a compensation item that is authorized under Section 15(a)(1)(A). Entitlement issues and compensation awards under the Program are uniquely fact intensive. Each case requires application of the statutory standards to a factual nexus that is peculiar to the particular petitioner. Considerations that apply to a determination of the amount of compensation that may be appropriate for "reasonable projected" expenses, after a decision on entitlement, reach to the outer limits of the discretion vested in a special master in the Program, and requires comprehensive application of all relevant factual patterns in the entire record. General observations as to statutory criteria applicable to specific items of compensation in the factual context of a particular case are not readily transferred to the factual pattern in another case.

The factual backgrounds of the petitioners in *Potter* and *Hulsey* differ substantially from the facts that apply to petitioner in this case. The petitioner in *Potter* was a multiply handicapped 6–year old who would require extensive assistance for the remainder of life. In *Hulsey*, the petitioner was a brain damaged 11–year old who also would require extensive assistance for the remainder of life. Petitioner in this case, on the other hand, is an adult graduating from college who can perform the activities required for daily living. It is reasonable to assume that she will be competitively employed following graduation.

In *Potter*, $50,000 was allowed as a "reserve fund for unforeseen contingencies" and was labelled "contingency fund." In *Hulsey*, $66,676 was awarded for "fiduciary services," which did not fall within the definition of "case management services," a term of art in Section 15(a)(1)(A)(iii)(II). In this case, $10,000 was allowed for unexpected costs incurred during any period during which petitioner may not be insured, and was labelled "one-time up-front allotment." Clearly, in *Potter, Hulsey*, and in this case, it is the factual underpinning that is determinative; the label applied does not control a determination of allowability of the award.

The facts that make *Potter* and *Hulsey* different from this case are more substantial than labelling differences. In *Potter*, the record afforded the court no basis to conclude that the "contingency fund" augmented an inadequate annuity. 22 Cl.Ct. at 705. In *Hulsey*, the court determined that the award was outside the definition of the statutory term. 19 Cl.Ct. at 334. On their particular facts, disallowance of the $50,000 award in *Potter*, and the $66,676 award in *Hulsey*, was appropriate.

In this case, petitioner requested compensation for health care coverage for 43 years (ages 22 to 65). In the life care plan prepared by petitioner's vocational rehabilitation counselor, the total cost of this coverage (on the basis of the difference in costs between a plan provided for uninsured disabled individuals by Indiana Comprehensive Health Coverage Insurance Association and an individual plan through Blue Cross/Blue Shield) was estimated at $101,428. The life care plan presented by respondent's nurse clinical specialist provided health insurance coverage on the basis of 20 percent self pay under a group plan to age 65. The special master concluded that health care insurance coverage as requested by petitioner was not warranted as a reasonable expense. The special master explained that this decision was based (1) on the assumption petitioner

would be covered by a group policy when she is employed; (b) an award of 100 percent coverage of vaccine-related medical expenditures for a period of 2 years after graduation; and (c) an award of a one-time allotment to cover unexpected medical expenses.

The special master's decision recognizes that reasonably there would be a 2–year period after graduation during which petitioner would not have access to health care insurance because (1) she was looking for employment and (2) after employment the group policy would exclude coverage for a period of time for a preexisting condition. Petitioner's inability to obtain health insurance coverage during this projected 2–year period is a "result from the vaccine-related injury." Section 15(a)(1)(A)(i). For an adult in the situation and physical condition of petitioner, a one-time allotment of $10,-000 is a reasonable projection of the expense attributable to this lack of health insurance coverage, in addition to the costs of medical care, medical tests and medication the special master made provision for during the period. Section 15(a)(1)(A)-(iii)(I). The allotment is a reasonable augmentation of an otherwise inadequate annuity.

The special master's explanation of the one-time, up-front, allotment was inartfully expressed. The allotment is said to be a reasonable amount to cover "unexpected occurrences or unplanned expenditures" and gives four examples. Respondent seizes upon this lack of precision to support its designation of the $10,000 as a "contingency fund." To the extent that the allotment includes a contingency fund within the limits prohibited in *Potter*, or a use prohibited on the facts of *Hulsey*, the allotment would be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

In a review of a special master's decision, when there has been a failure to comply with the statutory standards, Section 12(e)(2)(B) authorizes the Claims Court to set aside any findings of fact or conclusions of law of the special master, and to substitute its own findings of fact or conclusions of law for any so set aside. The court's rules, in Appendix J, implement this authority in somewhat broader language, in that the "judge's own decision" may be issued. RUSCC Appendix J, Ill.5.b. The special master's explanation for the allotment may be construed to fail under the statutory standard. It is appropriate, in the interest of clarity, to recast the explanation for the $10,000 allotment so as to define its reach and its purpose.

On the basis of the authority in Section 12(e)(2)(B), the explanation in the decision of the special master for a one-time, up-front, allotment (slip op., page 20) is set aside and the following explanation is substituted:

Although not requested, a one-time, up-front, allotment of $10,000 will be provided for through the annuity in the first year. [Footnote 48 is deleted.] This allotment is a reasonable estimate of the cost of any hospitalization or other medical expenditures that may be incurred, in addition to the calculations on Attachment A for medical care, medical tests, and medication, during the period 1991–93, during which period petitioner may not have health care insurance.

Petitioner's objections to the decision center upon the special master's assumptions (1) that petitioner will be competitively employed following graduation and (2) that group medical insurance coverage will be available through such employment. These assumptions, petitioner contends, result in an award that fails to meet the "rationality" standard established in *Hyundai Electronics, supra*.

In large part, petitioner's memorandum of objections is a reargument of her requests for insurance coverage, job counseling, and part time companion care. The special master, in the decision, discussed each of these requests fully, considered the relevant evidence in the record, and stated the reasons for denial of the requests. When the arbitrary and capricious standard is examined under the rationality test, the decision should be affirmed if the relevant factors have been considered, and no clear error of judgment has been made.

■ The special master's assumption that petitioner would become competitively employed following graduation from college was based on substantial evidence in the record. It is clear from the evidence considered by the special master that petitioner is fully employable. In order for petitioner to be eligible for group insurance coverage, she must obtain work in a company or organization large enough to qualify for a group policy. This problem was recognized and considered by the special master. Given petitioner's background in business administration, and in finance, as the special master found, it is reasonable to assume petitioner would find employment with an organization large enough to qualify for a group policy. The special master's assumption that petitioner would be responsible for a 20 percent copayment for covered medical expenses up to age 65 was not an abuse of discretion. The special master is entitled to take judicial notice of United States Department of Commerce 1985 statistics that show 81.7 percent of individuals with private health insurance had insurance related to their employment.

■ Petitioner cites three cases, decided by other special masters, to support the contention that it was an abuse of discretion in this case to refuse to award the costs of medical insurance or the direct costs of care. *Delozier v. Secretary of HHS*, No. 89–49V, slip op., 1990 WL 270202 (Cl.Ct.Sp.Mstr., Oct. 10, 1990); *Shaw v. Secretary of HHS*, No. 89–7V, slip op., 1989 WL 250126 (Cl.Ct.Sp.Mstr., Sept. 22, 1989); and *Vineyard v. Secretary of HHS*, No. 89–55V, slip op., 1990 WL 293374 (Cl. Ct.Sp.Mstr., June 29, 1990). The facts in these cases are not apposite to petitioner's situation. Decisions of special masters are not binding precedent.

■ Petitioner also contends that the decision arbitrarily forces her to obtain employment in Indiana, and restrict her freedom to select a job of her choice. The memorandum of objections states, because petitioner has been adjudged entitled to compensation under the Program:

> She has rights she did not have prior to this finding. Those rights are dependent on the presence of medical care coverage for her vaccine-related injuries. Thus, she has the right *not to* work. She has the *right* to marry, have children, and to stay at home with her children. She has the *right* to a job of her choosing, one which is appropriate for her capabilities and disabilities.
>
> The decision of the special master has extinguished these rights.

[Emphasis in the original.]

This argument is without merit. Compensation awarded under the Program shall be for "reasonable projected unreimbursable expenses which result from the vaccine-related injury." Section 15(a). However, payment of compensation "shall not be made for any item or service to the extent that payment ... can reasonably be expected to be made" from other sources except Medicaid. Section 15(g). Although an award of compensation should provide that which is to meet the basic needs of the injured person, such an award is not required to optimize the injured person's quality of life. There is nothing in the special master's decision which requires petitioner to work in the State of Indiana. She is free to live and to work wherever she pleases. The special master's award of compensation and its payments will follow the petitioner wherever she chooses to go. Contrary to petitioner's assertion, the special master's decision has not condemned the petitioner to a life time of involuntary servitude.

On the basis of the foregoing, petitioner's objections to the decision of the special master are rejected; defendant's objection is accepted to the extent that the decision as to the one-time, up-front allotment is clarified, and in all other respects, defendant's objection is rejected. The special master's decision as to compensation and the direction to respondent to purchase and take ownership of an annuity as set forth in the decision is sustained.

The Clerk is directed to enter judgment in accordance with the decision of the special master as modified herein.