**Jason Thomas TAYLOR, a Minor By and Through His Next Friends Thomas W. TAYLOR and Janice T. Taylor, Petitioners,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–792V.

United States Claims Court.

Oct. 31, 1991.

A. LeRoy Toliver, Atlanta, Ga., attorney of record, for petitioners. Simmons & Toliver, of counsel.

Gerard W. Fischer, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent. Helene M. Goldberg, Director, John Lodge Euler, Deputy Director, and Charles R. Gross, Asst., Director, of counsel.

## OPINION

FUTEY, Judge.

This matter is before the court on petitioners' motion for review of the special master's decision.[1] On July 18, 1991, the special master awarded an annuity as compensation for the petitioners' vaccine-related injury. Also, the special master allotted a "reserve fund" of $20,000.00 for each of the first 4 years of the award and a one-time lump sum of $75,000.00 for an acute assessment. Petitioners contend that the special master's failure to award for residential placement until the age of 21, annual dental care after 1992 and transportation expenses was arbitrary, capricious, an abuse of discretion, and contrary to law. Respondent maintains that the special master's decision was "fully in accordance with law" and should, therefore, be affirmed. For the reasons stated below, the court sustains the decision of the special master as to the residential placement and transportation expenses. The court remands for a determination on dental care.

### Factual Background

Jason Thomas Taylor (Jason) born February 11, 1981, at 11.00 a.m., received three administrations of diphtheria, pertussis, and tetanus (DPT) during his first year. After his third shot in Lilburn, Georgia, on June 11, 1981, Jason became feverish and began twitching and vomiting. Approximately 4 hours after the vaccine was administered, Dr. Edward S. Fischer observed a "hard generalized seizure."[2] Subsequently, Jason developed a seizure disor-

---

1. This Opinion may contain material which should not be disclosed to a nonparty pursuant to 42 U.S.C. § 300aa–12 (1987). The parties shall therefore designate, within 14 days from the date of the Opinion, any material subject to § 300aa–12. Said material will be deleted from the Opinion prior to public distribution. If neither party files objections within this 14-day period, the court will assume that the Opinion contains no material subject to § 300aa–12.

2. Petition at p. 2.

der, characterized by generalized seizures, hyperactivity, and mental retardation.

Jason is ambulatory and can feed himself with a fork and spoon. He is a large child for his age, weighing 120 pounds and, in recent years, he has become aggressive. Although he can vocalize individual words, he is incapable of coherent speech. Currently, Jason attends a public school in a classroom for severely emotionally disturbed children.

On September 27, 1988, petitioners, Thomas W. Taylor and Janice T. Taylor, as natural parents and guardians of Jason, commenced an action, concerning Jason's condition in U.S. District Court for the Northern District of Georgia. That petition was dismissed, without prejudice, on May 23, 1990, so that petitioners could commence the present action. Petitioners commenced action in this court on August 20, 1990, under the National Childhood Vaccine Act of 1986, as amended 42 U.S.C. § 300aa–1 *et seq.* (1988) (Vaccine Act), requesting compensation for the vaccine-related injury of Jason. On December 24, 1990, respondent conceded that Jason's condition was presumptively vaccine-related.

The special master conducted an evidentiary hearing on April 18, 1991, to determine the future unreimbursable medical and other expenses to which Jason is entitled under the Vaccine Act. Petitioners presented expert medical testimony and submitted a life care plan in support of their position. The special master issued a decision on May 30, 1991, determining the compensation due petitioner in accordance with § 300aa–15(a) and (b) of the Vaccine Act. The special master compensated petitioner by awarding an annuity,[3] determining that this form was in "Jason's best interest." *Taylor v. Secretary DHHS*, Cl. Ct. No. 90–792V (spec. master slip op. at 7

(May 30, 1991)) 1991 WL 105438. In addition, the special master, ordered that the sum of $20,000.00 should be paid directly to petitioners from each of four annual installments of the award. This sum was awarded "to allow the petitioners some degree of flexibility in meeting needs which are foreseeable but the timing of which is not entirely predictable." *Id.* The special master concluded that it is "not within the responsibility or authority of this program to provide either the acute or long-term residential care requested." *Id.* According to the special master, the State of Georgia could reasonably be expected to pay for the residential treatment under the Individuals with Disabilities Education Act (IDEA). 20 U.S.C. § 1400 *et seq.* (1988).

On June 13, 1991, petitioners filed a motion for reconsideration to the special master. They alleged that the special master erred in relying on the IDEA as an offset to the amount of compensation due Jason. Petitioners also disputed the $400.00 yearly allowance for dental care awarded, asserting that the award was contrary to the evidence.

On July 18, 1991, the special master issued a revised decision. He again concluded that under the IDEA, the state is primarily responsible for Jason's residential placement, but awarded a one-time lump sum of $75,000.00 for an acute assessment.[4] The special master noted that, once completed, the acute assessment will be excellent evidence of Jason's need for residential care. Thus, Jason's parents "will be properly armed to demonstrate that need (for residential care) to the State of Georgia." *Taylor v. Secretary DHHS*, Cl. Ct. No. 90–792V (spec. master slip op. at 6 (July 18, 1991)), 1991 WL 146258. The special master also denied the increase in dental care.

3. The special master awarded the following amounts:

| Period | Total Annual Costs |
| --- | --- |
| 1991 | $ 5,237 |
| 1992 | $ 3,874 |
| 1993–1995 | $ 4,786 |
| 1996 | $ 7,786 |

| Period | Total Annual Costs |
| --- | --- |
| 1997–2001 | $ 4,786 |
| 2002–2017 | $51,186 |
| 2018 + | $50,813 |

4. An acute assessment is an in-depth analysis of Jason's needs that will require 3 months of hospitalization.

On August 16, 1991, petitioners filed a motion for review of the special master's decision. Petitioners aver that the special master erred in disregarding evidence that supported an award for the cost of a residential facility, and in determining that the IDEA is an offset to compensation under the Vaccine Act. Petitioners also object to the amount of compensation for dental care and the denial of future travel expenses. On September 16, 1991, respondent filed a memorandum in response asserting that the special master's decision was rationally based and fully in accordance with law.

*Discussion*

I. *Standard of Review*

Section 300aa–12(e)(2) of the Vaccine Act, as amended, provides in relevant part:

> (2) Upon the filing of a motion under paragraph (1) with respect to a petition, the United States Claims Court shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter—
>
> > (A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,
> >
> > (B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of facts and conclusions of law, or
> >
> > (C) remand the petition to the special master for further action in accordance with the court's direction.

In addition, Rule 5 of the Vaccine Rules, (RUSCC, App. J, Sec. III, *Judges Review*) mirrors the statutory language set forth above.

■ In reviewing the special master's decision, the court may, therefore, set aside findings of fact and conclusions of law which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Hines v. Secretary DHHS*, 940 F.2d 1518 (Fed.Cir.1991). Under this standard of review, the court may not substitute its judgment for that of the special master. *Munn v. Secretary DHHS*, 21 Cl.Ct. 345 (1990). In limiting the standard of review, Congress noted that it did "not intend that this procedure be used frequently but rather in those cases in which a truly arbitrary decision has been made." 135 CONG.REC. 9477 (daily ed. Nov. 21, 1989). Thus, the court may only overturn the findings and conclusions reached below where review of the record reveals that no rational basis exists for the decision. *Hyundai Electronics Industries Co. v. United States Int'l Trade Comm.*, 899 F.2d 1204, 1209 (Fed.Cir.1990).

II. *Residential Placement*

Section 300aa–15(a) of the Act authorizes the special master to award compensation for:

> (1)(A) Actual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses which-
>
> > (i) result from the vaccine-related injury for which the petitioner seeks compensation,
> >
> > (ii) have been or will be incurred by or on behalf of the person who suffered such injury, and
> >
> > (iii)(I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or
>
> (II) have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

42 U.S.C. § 300aa–15(a)(1). Nonetheless, payment otherwise mandated by the above section is limited by § 15(g) which states:

> Payment of compensation under the Program shall not be made for any item or service to the extent that payment has been made, or can reasonably be expected to be made, with respect to such item or service (1) under any State compensa-

tion program, under an insurance policy, or under any Federal or State health benefits program (other than under Title XIX of the Social Security Act [42 U.S.C.A. § 1396 et seq.]), or (2) by an entity which provides health services on a prepaid basis.

In applying § 15(g) to the petitioners' request for residential care, the special master looked to the IDEA, as an offset. The State of Georgia has accepted funding from the IDEA, and is bound by its rules. After determining that the IDEA would provide for Jason's residential placement, the special master denied funding for residential placement under the Vaccine Act.

Petitioners assert that the special master erred in determining that the IDEA constitutes an offset to compensation awarded under the program, and argue that his refusal to award residential facility costs runs counter to the evidence. Respondent replies that the facts concerning Jason's need for residential placement are irrelevant because the IDEA clearly assumes the responsibility for such placement; Jason's need for residential placement is a matter more properly presented to the State of Georgia. It is important, therefore, to parse the IDEA and relevant regulations to discover whether the IDEA will, in fact, provide for Jason's residential placement. If the IDEA is found to provide for Jason's placement then it will constitute an offset to the amount of compensation that would otherwise be provided to Jason under the Vaccine Act.

A. The IDEA

■ The purpose of the IDEA is:
[T]o assure that all handicapped children have available to them ... a free appropriate public education which emphasizes *special education and related services designed to meet their unique needs....* [Emphasis added.]

20 U.S.C. § 1400(c). The term "special education" is defined as "specially designed instruction, *at no cost to parents or guardians*, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education,

home instruction, and *instruction in hospitals and institutions."* [Emphasis added.] 20 U.S.C. § 1401(16). Jason's need for institutional special education, therefore, is encompassed by the IDEA.

Federal regulations under the IDEA, moreover, clarify that the primary responsibility for education for the handicapped lies with the IDEA.

> This provision is included specifically to assure *a single line of responsibility* with regard to the education of handicapped children, and to assure that in the implementation of all provisions of this Act and in carrying out the right to education for handicapped children, the State educational agency shall be the responsible agency * * *.

> Without this requirement, there is an abdication of responsibility for the education of handicapped children. Presently, in many States, responsibility is divided, depending upon the age of the handicapped child, sources of funding, and type of services delivered. While the Committee understands that, different agencies may, in fact, deliver services, *the responsibility must remain in a central agency overseeing the education of handicapped children,* so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency. (*Citing* Senate Report No. 94–168, p. 24 (1975). [Emphasis added.]

34 C.F.R. § 300.600, comment "Responsibility for all educational programs." Thus, not only does the IDEA specifically provide for educational placement in institutions, but it also assumes the primary role for providing for the education of handicapped children. It mandates that when there are conflicting sources of funds for handicapped education, the IDEA remains the "central agency" for provision of those services. Because the IDEA is the central responsible agency for education for the handicapped, Jason's residential placement should be provided by the IDEA rather than the Vaccine Act.

Georgia case law also supports the position that under the IDEA, the states, them-

selves, are the primary source for educational programs for the handicapped. In *Drew v. Clarke County School Dist.*, 877 F.2d 927 (11th Cir.1989), the court found that the State of Georgia was responsible for paying the tuition for a handicapped child at a center for autistic children. *See also Georgia Ass'n of Retarded Citizens v. McDaniel*, 716 F.2d 1565 (1983). Petitioners cite *Joseph K.*, 3 EHLR 502:133 Ga. (1980), in support of their position that the State of Georgia will not pay for Jason's residential placement. *Joseph K.*, is, however, inapplicable to the current case. In that case, petitioners requested that the child be removed from his home because his home life was unstable, rather than because the school district could not provide an appropriate education. The state educational agency denied the request. Whereas a state is not required under the IDEA to place a child in a stable home setting, it is required to provide adequate education, be it at home or in an institution.

██ A threshold issue in this case centers on whether residential placement is educational or medical in nature. *Brown v. Wilson County School Bd.*, 747 F.Supp. 436, 442 (M.D.Tenn.1990). Sheer medical placement alone is not within the purview of the IDEA. 20 U.S.C. § 1401(16), (17). Hence, medical placement could not reasonably be expected to be funded under the IDEA. If Jason's placement is purely medical in nature, then the IDEA would not be the appropriate source of funds for the placement, and the responsibility would fall back on the Vaccine Act. Petitioners correctly stress that residential care might not in fact be "educational" just because it is so denominated. Petitioners point to "the need for residential placement based on Jason's significant behavioral problems, his physical size, his aggressiveness, his potential and actual propensity for harm to himself and others and his inability to be managed at either his present school placement or home environment."[5] Nonetheless, Congress enacted the IDEA with the desire "that 'unique educational needs'

be broadly construed to include the handicapped child's academic, social, health, emotional, communicative, physical and vocational needs." H.R.REP. No. 410, 98th Cong. 1st Sess. 19, *reprinted in* 1983 U.S.CODE CONG. & ADMIN.NEWS 2088, 2106. Moreover, it has been noted that "[w]here basic self help, and social skills such as toilet training, dressing, feeding and communication are lacking, formal education begins at that point." *Battle v. Pennsylvania*, 629 F.2d 269 (3d Cir.1980). Thus education, under the IDEA, is meant to encompass the broad base of behavioral modification necessary for basic educational skills. It was not clear error, therefore, for the special master to find that the residential placement was educational in nature, and as such, was the primary responsibility of the State of Georgia under the IDEA.

██ Petitioners also aver that the IDEA is not a "state compensation program" as required in § 15(g), and is, instead, a federal program. Section 15(g) of the Vaccine Act, makes the Act the secondary payor where there is an alternate source of funding from a "state compensation program." Hence, if the IDEA is not a state compensation program it could not be considered an offset. Respondent asserts that this is a too narrow interpretation of a state compensation program. The court is inclined to agree. Federal regulations under the IDEA provide that "the agency may use whatever State, local, Federal, and private sources of support available for those purposes." 34 C.F.R. § 300.346 pt. 300, App. C at 88. Consequently, funding for the program may come from state, local, or private sources, as well as federal sources. Although it draws on federal funds the IDEA is also a state and local program. It was reasonable for the special master to denominate the IDEA a state compensation program and to offset the amount available from the Vaccine Act. The special master's decision is rationally based on the plain language of the statute and Georgia

---

5. Motion for Review, p. 3.

case law.[6]

### B. The Stotts Decision

Petitioners further urge the court to adopt the decision in *Stotts v. Secretary DHHS*, 23 Cl.Ct. 352 (1991). The *Stotts* case was factually similar in that it involved a dispute over whether the IDEA should be considered an offset to compensation available under the Vaccine Act. Unlike the present case, however, the Stotts child was "severely retarded, and ... not expected to function much above the level of a six-month old infant." *Id.* at 356. The child was much more severely compromised than Jason. In addition, there was no showing that the California School system would meet the child's "tremendous needs." *Id.* at 371. The special master found that "special education programs were geared towards handicapped children with far greater potential for intellectual function and less significant physical impairment." *Id.* In that case, the special master determined that it could not reasonably be anticipated that the State of California would pay for the education.

In the instant case, Jason is currently attending public school and his education is being provided for by the State of Georgia. Although Jason's placement may not be optimal, an award of compensation is not required to optimize an injured person's quality of life. *Schwenk v. Secretary DHHS*, 23 Cl.Ct. 287, 294 (1991).

Yet, in so far as *Stotts* holds that the IDEA generally does not provide for an offset to amounts awarded under the Vaccine Act, this court declines to follow. Offsets to the Vaccine Act are allowed under § 15(g) of the Act when "payment has been made, or can reasonably be expected to be made, with respect to such item or service" from a state compensation program. In construing the statute concerning the provision "payment," "[i]t is axiomatic that the 'starting point for interpreting a statute is the language of the statute itself' and that 'absent a clearly expressed legisla-

tive intention to the contrary, that language must ordinarily be regarded as conclusive.'" *Id.* at 371 *citing Ulmet v. United States*, 822 F.2d 1079, 1082 (Fed.Cir. 1987) (citation omitted). The language of the IDEA defines "free appropriate public education" as education that has *"been provided at public expense,* under public supervision and direction, and without charge." [Emphasis added.] 20 U.S.C. § 1401(18)(A). The IDEA contemplates, moreover, that "special education" can include "instruction in hospitals and institutions." 20 U.S.C. § 1401(16). Although the IDEA does not specifically state the mode of payment for these services, the regulations thereunder clarify—

> The public agency responsible for the education of a handicapped child could provide ... services to the child (1) directly, through the agency's own staff resources, or (2) *indirectly, by contracting with another public or private agency, or through other arrangements.* [Emphasis added.]

34 C.F.R. § 300.346 pt. 300, App. C at 88. The directive to contract with other agencies implies a definite payment rather than simply a provision of services. Thus, when residential placement is necessary to ensure educational development, the state must take on the burden of providing the services or, alternatively, *pay* private institutions to provide the service.

Georgia case law has also recognized that the state must pay for institutional care in some cases. In *Drew, supra,* under the IDEA, the State of Georgia was required to pay for a handicapped child's residential placement in a center for autistic children. Thus, the language of the IDEA, regulations thereunder, and case law support that the IDEA contemplates payments for education for the handicapped.

Although the vaccine fund was conceived by Congress as a vehicle through which "awards can be made to vaccine-injured persons quickly, easily, and with certainty and generosity," it also is a limited fund. H.R.Rep. No. 99–908, 99th Cong., 1st ses-

---

**6.** It is unnecessary for the court to reach the issue of whether the special master arbitrarily disregarded the evidence as to Jason's require-

ments for residential placement. If such placement is needed, it will be provided by the State of Georgia.

sion at 3, *reprinted in* 1986 U.S.CODE & ADMIN.NEWS, 6287, 6344. Therefore, in order to be generous to all vaccine-injured individuals, 42 U.S.C. § 300aa–15(g) provides that the Vaccine Act is not primarily liable where there is another source of funds available.

▮ In short, the court cannot conclude that the special master's decision to deny compensation for residential placement was arbitrary, capricious, or an abuse of discretion.[7]

### III. *Dental Care*

▮ In his decision, the special master found that Jason had an "immediate need for extensive dental care." The special master also determined that, in light of Jason's behavioral difficulties, Jason must be anesthetized, under hospital supervision, in order to receive appropriate dental care. Nonetheless, the special master concluded that this dental care was an immediate, rather than a recurrent need. Accordingly, he decided that petitioners' insurance, which runs through 1992, would cover the "immediate" need for hospitalization. The special master then awarded $400.00 annually for actual dental costs, without hospitalization.[8]

The conclusion that Jason only needs "immediate" dental care runs contrary to the evidence submitted at the hearing. Helen M. Woodard, a certified rehabilitation counselor testified that Jason's teeth need "to be checked regularly."[9] Moreover, there was unrebutted testimony that Jason required general anesthesia and corresponding hospitalization for mere dental examinations.[10] Thus, Jason's need for hospitalized dental care is more than just an "immediate" cost. Rather, it is an annual cost.

Jason will need regular dental care and corresponding hospitalization after petition-

ers' insurance lapses in 1992. This matter is remanded to the special master for a determination of the amount necessary to properly cope with Jason's future dental hospitalization needs.

### *Conclusion*

For the foregoing reasons, the court determines that as to the residential placement and travel expenses, the special master's decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The court upholds the special master's findings of fact and conclusions of law that the petitioners are not entitled to recover under the National Vaccine Injury Compensation Program for residential placement or for related transportation expenses. The special master's decision concerning the dental care award is remanded for a further determination on the requirements for hospitalization after 1992. The Clerk is directed to enter judgment accordingly. No costs.

---

**7.** Since the court denies residential placement, it is not necessary to reach the request for a 7 percent escalator for the residential placement funds. Petitioners also request funds for their travel expenses when visiting Jason. 42 U.S.C. § 300aa–15(a)(1)(A)(iii)(II) provides for compensation for "related travel." It was not, however, an abuse of discretion for the special master to find that related travel does not include

travel for the injured person's parents and is, instead, limited to travel by the injured person himself.

**8.** Hearing transcript (tr.), p. 31.

