Juanita STOTTS and Joseph Stotts, as guardians for Benjamin Stotts, Petitioners,

v.

SECRETARY OF The DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 89–108V.

United States Claims Court.

June 4, 1991.

Carole A. Klove, Los Angeles, Cal., attorney of record, for petitioners.

Thomas J. Mancuso, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## OPINION

REGINALD W. GIBSON, Judge:

Juanita and Joseph Stotts seek compensation under the National Vaccine Injury Compensation Program, *codified as amended at* 42 U.S.C.A. §§ 300aa–10 *et seq.* (West Supp.1991) (the Program), for injuries sustained by their son Benjamin following the administration of the DPT vaccine on December 29, 1988.[1] On Octo-

---

1. Benjamin received his vaccination (on December 29, 1988) almost two months after the Octo-

ber 11, 1990, Special Master Elizabeth R. Wright ordered the respondent to pay a substantial lump sum award out of the Program trust fund to compensate the petitioners for those vaccine-related injuries. From these "proceeds," she ordered the respondent to pay a lump sum award totaling $733,532.52 directly to the petitioners without restriction, as detailed *infra*. She also ordered the respondent to purchase an annuity contract for approximately[2] $2,369,674.00 to cover certain projected vaccine-related expenses with a stream of monthly payments for the remainder of Benjamin's life.

The respondent concedes that Benjamin sustained vaccine-related injuries, and that the petitioners are entitled to compensation under the Program. However, it objects to the amount awarded for certain elements of compensation and the manner of payment. In this context, it asserts that Special Master Wright acted arbitrarily, capriciously, with an abuse of discretion, or contrary to law when she (1) ordered that the compensation awarded for lost earnings under § 300aa–15(a)(3)(B)[3] be included in the immediate lump sum payment under the authority of § 300aa–15(f)(4)(A) rather than ordering that this part of the award be funded through the purchase of an annuity that would commence payment when Benjamin begins to suffer actual loss of earnings at age 18; (2) awarded $150,000 for future pain and suffering under § 300aa–15(a)(4), and included that amount in the lump sum payment under the authority of § 300aa–15(f)(4)(A) rather than ordering that this part of the award be funded through the purchase of an annuity; (3) ordered that the compensation awarded for architectural modifications under § 300aa–15(a)(1)(A) be included in the lump sum payment under the authority of § 300aa–15(f)(4)(A) rather than ordering that this part of the award be funded through the

purchase of an annuity; and (4) failed to offset the cost of special educational services that the public school system would be obligated to furnish under the Education for All Handicapped Children Act (EAHCA), 20 U.S.C. §§ 1400 *et seq.*, against the amount of compensation awarded for future rehabilitation expenses, as she was allegedly required to do under § 300aa–15(g).

On April 8, 1991, we remanded the petition to the special master for further findings of fact and conclusions of law on the issue of—whether the $150,000 lump sum award for future pain and suffering under § 300aa–15(a)(4) should be adjusted to reflect its net present value under § 300aa–15(f)(4)(A). The special master filed a supplemental decision on June 3, 1991, concluding that such awards for future pain and suffering should not be reduced in this manner, notwithstanding the foregoing statutory provision. Thus, the petition is now ripe for complete review. For the reasons discussed hereinafter, we find no merit in any of the four objections raised by the respondent. On the other hand, we do find that the special master committed a clear error of law by failing to reduce the $150,000 lump sum award for future pain and suffering to reflect its net present value. Thus, the special master is AFFIRMED IN PART and REVERSED IN PART.

## BACKGROUND

Benjamin Stotts was born on August 31, 1988, and received his second DPT vaccination on December 29, 1988, at approximately four months of age. Within 14 hours Benjamin began to display symptoms of injury. His parents described him as unresponsive, diaphoretic, and observed that he had trouble breathing. They immediately

ber 1, 1988 effective date of the Program. *See* 42 U.S.C.A. § 300aa–1 note (West Supp.1991). Thus, this is a so-called "post-act" petition. The significance of this fact lies in the types and amount of permissible compensation, *see infra*.

**2.** The actual cost of the annuity contract award will depend on the cost charged at the time the annuity contract or contracts are purchased; if

the respondent can purchase the annuities for less, the award will be reduced accordingly, while it will be increased if the cost of purchasing the annuity has increased.

**3.** The relevant text of this and other statutory provisions are set out where appropriate *infra*.

took him to the hospital emergency room, where examinations indicated that Benjamin was the victim of some sort of neurological damage. The special master ultimately found that Benjamin experienced an encephalopathy,[4] and that this condition resulted in numerous disabilities.

For example, Benjamin has regressed dramatically since the December 29, 1988 inoculation. Prior to that time, he appeared to develop according to medical expectations, and no disabilities were observed or diagnosed over the course of his first four months of life. However, following the DPT vaccination, Benjamin experienced convulsive seizures, and these seizures were documented as recently as November 1989. In fact, the special master observed that Benjamin may still be experiencing mild convulsive episodes. Benjamin suffers from a sleep disorder, has trouble eating and drinking, and is constantly constipated. He is cortically blind,[5] and is only able to track large objects. He has orthopedic problems and also suffers from scoliosis, all of which will require surgical interventions in the near future. Moreover, Benjamin is severely retarded, and he is not expected to function much above the level of a six-month-old infant. Any gains that do occur will be modest at best. He cannot walk, cannot feed himself, and will never be employable or able to assume responsibility for his own affairs. Based on this evidence, the petitioners alleged that they are entitled to compensation under the Program, and both the respondent and the special master agreed.

A hearing was held on May 17, 1990, to determine the amount of restitution necessary to compensate Benjamin for his vaccine-related injuries. The petitioners filed two life care plans, which were based on a review of all the relevant medical records,[6] interviews with the parents, and interviews with an independent physical therapist and an independent neuropsychologist. The respondent also submitted a life care plan, which was based on all of the relevant medical records, a review of the two life care plans supplied by the Stotts, and an interview with yet another neurologist. The special master considered these three plans, the testimony of the parents, and the expert testimony of two pediatric neurologists in her compensation analysis.

After engaging in an exhaustive review of the foregoing and other record evidence, the special master determined that the petitioners were entitled to substantial damages. She looked to the general rule of compensation enunciated in § 300aa–15(a), and concluded as a matter of law that it provided for compensation, as appropriate under the facts, in four general categories. Thus, she awarded compensation for (1) future unreimbursable medical and rehabilitation expenses, § 300aa–15(a)(1)(A), for medical care providers, treatment and hospitalizations, diagnostic testing, therapies and educational services, equipment and supplies, transportation and related equipment, home modifications, and residential and custodial care expenses; (2) past unreimbursable medical and rehabilitation expenses, § 300aa–15(a)(1)(B), for past medical expenses, telephone costs, transportation expenses, miscellaneous equipment expenses, partial compensation for a modified van, automobile insurance, and the cost of wages for an au pair attendant; (3) lost earnings, § 300aa–15(a)(3)(B), calculated from the time Benjamin will turn 18 years of age through what would have been his working years; and (4) actual and projected pain and suffering, § 300aa–15(a)(4). She then considered whether the award should be reduced to account for any available offsets under § 300aa–15(g).

Having decided that the petitioners were entitled to compensation for Benjamin's

---

**4.** According to § 300aa–14(b)(3)(A), "[t]he term 'encephalopathy' means any significant acquired abnormality of, or injury to, or impairment of function of the brain."

**5.** Cortical blindness is "blindness due to a lesion of the cortical visual center." *Dorland's Illustrated Medical Dictionary* 216 (27th ed. 1988).

**6.** These medical records include, among others, the files of Benjamin's neurologist, pediatrician, physical therapist, and a development specialist.

vaccine-related injuries in each of these four general categories, Special Master Wright then concluded as a matter of law that the method of payment under the Program and her authority in controlling the disbursement of a compensation award were governed solely by § 300aa–15(f)(4)(A). Under that section, she ordered the respondent to pay all of the compensation award out of the Program trust fund in a single lump sum. Also under the authority of § 300aa–15(f)(4)(A), the special master concluded as a matter of law that she could order either that all or part of that lump sum payment from the Program trust fund be given directly to the petitioners without any further restrictions whatsoever, or that all or part of that lump sum payment be used to purchase an annuity contract or contracts that would provide a lifetime stream of income payments to cover projected costs. SMD at 25. In accord with this interpretation of § 300aa–15(f)(4)(A), Special Master Wright decided that a portion of the proceeds from the lump sum payment from the Program trust fund should be disbursed to the petitioners immediately, without restrictions, and that the balance of the lump sum payment from the Program trust fund should be used by the respondent to purchase an annuity to fund the projected compensable expenses.

Thus, on October 11, 1990, the special master ordered the respondent to make an immediate $733,532.52 lump sum payment to the petitioners. This figure included $100,000 for past and $150,000 for projected pain and suffering, $199,474.48 for lost earnings stemming from impaired earning capacity, $33451.99 for past unreimbursed medical expenses, $48,626.05 for architectural modifications to the Stotts' home, $33,100.00 for one scoliosis and two wrist operations, $3,800.00 for therapeutic equipment, and $165,000.00 for unreimbursable first year medical expenses. The respondent was also directed to expend approximately $2,369,674.00 from the Program trust fund to purchase an annuity to finance the remainder of the medical and rehabilitation services that will be required to ameliorate Benjamin's vaccine-related injuries.

In opposition, the respondent filed a motion for review on November 13, 1990, raising the four objections previously referenced. On April 8, 1991, we remanded the petition for further findings and conclusions on the issue of—whether the $150,000 lump sum award for future pain and suffering should be reduced to its net present value. The special master filed her supplemental decision on June 3, 1991, and, as noted above, concluded that § 300aa–15(f)(4)(A) did not require her to reduce that element of compensation to its net present value. Nevertheless, the special master did provide us with the net present value calculations and the revised award figures that would result if this court were to find that the projected pain and suffering lump sum award must be reduced to its net present value. In other words, by making alternative findings and conclusions that applied the net present value language of § 300aa–15(f)(4)(A), the special master determined that the lump sum award for future pain and suffering would be reduced from $150,000 to $100,242.02. The total lump sum award with that adjustment would, therefore, be reduced from $733,532.52 to $683,774.54.

## ISSUES

In view of the foregoing, we must determine whether the special master acted arbitrarily, capriciously, with an abuse of discretion, or contrary to law when she (1) ordered that compensation for lost earnings due to impaired earning capacity be paid as part of the lump sum award rather than funding it through the purchase of an annuity; (2) awarded $150,000 for projected pain and suffering under § 300aa–15(a)(4), and by including this element of compensation in the lump sum award without reducing it to its net present value under § 300aa–15(f)(4)(A); (3) awarded compensation for future architectural modifications to the Stotts' home as part of the lump sum award; and (4) did not consider the alleged "mandate" of the EAHCA as an offset for special educational services.

## THE STANDARD OF REVIEW

Before addressing the issues raised by the respondent, we think it would be helpful to briefly review the purpose of providing compensation under the Program, and how the goals of the Program resulted in the deferential standard by which we are compelled to review the findings of fact and conclusions of law by the special master. It is now well settled that the Program established, in effect, a no-fault policy of providing compensation to individuals injured by pediatric vaccinations routinely administered before admission to the public school system. Congress emphatically intended to create a system that would furnish compensation for vaccine-related injuries "quickly, easily, and with certainty and generosity." H.R.Cong.Rep. No. 99–908, 99th Cong., 1st Sess. at 3, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344. In fact, its reasoning is that, by creating a system which does not require proof of the manufacturer's negligence, this program would have the potential to reverse the spiraling cost of childhood vaccines and the dwindling number of vaccine manufacturers caused by injured individuals seeking relief through the traditional tort system. It believed, therefore, that "the speed of the compensation program, the low transaction costs of the system, the no-fault nature of the required findings, and the relative certainty and generosity of the system's awards will divert a significant number of potential plaintiffs from litigation." *Id.* at 13, 1986 U.S.Code Cong. & Admin.News 6344, 6354.

Against this background, Congress created the Office of the Special Masters as an adjunct of the United States Claims Court,[7] and charged both with the duty of ensuring that individuals suffering from vaccine-related injuries would be able to secure a prompt, speedy, and fair resolution of their claims. The Office of the Special Masters was, therefore, created for the purpose of acting as an efficient, impartial investigator on two essential issues, namely, to determine—whether a petitioner suffered a compensable vaccine-related injury, and if so, the extent of compensable damages. *See id.* at 16, 1986 U.S.Code Cong. & Admin.News 6344, 6357. In this connection, special masters were initially authorized to make proposed findings of fact and conclusions of law under former 42 U.S.C. § 300aa–12(c)(2)(E) (1988), which could then be reviewed on a *de novo* basis by the Claims Court under former 42 U.S.C. § 300aa–12(d)(1) (1988).

However, it was not long before this statutory scheme created problems, and eventually became the subject of scathing criticism. *See Davis v. Secretary of the Department of Health and Human Services,* 19 Cl.Ct. 134 (1989). *Davis* noted the difficulties that were created by a *de novo* review of the proceedings before the special master. On the one hand, the special master was *not* bound by the traditional rules of evidence in developing proposed findings of fact and conclusions of law, while the Claims Court was, on the other hand, statutorily obligated to apply those rules in a *de novo* review of the decision below. Not surprisingly, this resulted in serious evidentiary and proof problems in the Claims Court, and, understandably, generated the undesirable effect of prolonging and complicating vaccine litigation, a consequence diametrically at odds with the legislative goals of Congress. Therefore, Congress attempted to correct these and other deficiencies with certain technical amendments contained in P.L. No. 101–239, 103 Stat. 2286 (1989) (the 1989 amendments). These changes, which constitute the current law, permit the special masters to make findings of fact and conclusions of law that will be entered as a final judgment unless there are objections by at least one of the parties. § 300aa–12(e)(3). Under § 300aa–12(e)(2),[8] an objection by either

---

7. During the legislative process, the Office of the Special Masters was *originally* installed as an adjunct to the United States District Court, but was made an adjunct to the Claims Court when Congress put the Program into effect on October

1, 1988. *See* former 42 U.S.C. § 300aa–12 note (1988).

8. Section 300aa–12(e)(2) provides, in relevant part, that:

party will trigger review jurisdiction in the Claims Court, but that review is now strictly limited to the record developed before the special master. The findings of fact and conclusions of law may be rejected by the Claims Court, but now only if they are arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. § 300aa–12(e)(2)(B).

In explaining the need for these changes, Congress explicitly chastised all of the parties involved in vaccine litigation for losing sight of Program goals and for, seemingly, recreating the entire adversarial system, which was not the intent of the original legislation. In this connection, it stated that:

Correction of these [Program] problems will require revision of the vaccine compensation process of the Special Masters and U.S. Claims Court and a re-dedication of all parties to the creation of an *expeditious, less adversarial, and fair system.*

Congress intended a quick, flexible, and streamlined system. *[The original legislation] called for a compensation procedure that administered awards "quickly, easily, and with certainty and generosity."* The system was intended to be "fair, simple, and easy to administer" and "to compensate persons with recognized vaccine injuries without requiring the difficult individual determinations of causation of injury."

[R]ather than establishing such a system, all participants have, to some degree, maintained their traditional adversarial litigation postures. The Claims Court has issued rules for vaccine proceedings that force proceedings to be formal and that virtually foreclose any opportunity for petitioners or respondents to proceed without litigators at their sides.... *Respondents have ...*

*mounted defenses incompatible with a no-fault system of compensation.*

*[T]he Conferees reiterate their intent that the vaccine injury compensation system be informal, flexible, and expeditious, and that all participants proceed accordingly.* The re-invention of the adversarial process will serve neither to compensate injured children nor maintain the stability of the immunization programs of the U.S.

\* \* \* \* \* \*

With such re-dedication to the original goals of the program, the Conferees anticipate that all participants will benefit. The system will provide compensation, eliminate the need for litigation and assure the continued availability of and public confidence in immunizations in the U.S.

\* \* \* \* \* \*

[The Claims Court standard of review now codified in 42 U.S.C.A. § 300aa–12(e)(2)(B) (West Supp.1990)] provides for an appeal of the [special] master's decision ... *under very limited circumstances.... The Conferees have provided for a limited standard for appeal from the [special] master's decision and do not intend that this procedure be used frequently but rather in those cases in which a truly arbitrary decision has been made.*

H.R.Conf.Rep. No. 101–386, 101st Cong., 1st Sess. at 512–513, 517, *reprinted in* 1989 U.S.Code Cong. & Admin.News 1906, 3115, 3120 (emphasis added).

 Consequently, our review of the decision by the special master here has been *severely* circumscribed. It has been narrowed to the extent that *both* findings of fact and conclusions of law can be overturned, under the plain language of § 300aa–12(e)(2)(B), only if they are arbitrary, capricious, an abuse of discretion, or

Upon the filing of a motion [for review and a memorandum of objections], the United States Claims Court shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter—
(A) uphold the findings of fact and conclusions of law of the special master and sustain the ... decision,

(B) set aside any findings of fact or conclusion[s] of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law
....

contrary to law. *See Hines v. Secretary of the Department of Health & Human Services,* 21 Cl.Ct. 634, 639 (1990) (the arbitrary, capricious, and abuse of discretion standard of review applies to both the findings of fact and the conclusions of law by the special master). In this sense, the special master's findings and conclusions will be deemed "arbitrary and capricious" only if she—relied on factors which Congress did not intend for her to consider, entirely failed to consider an important aspect of the problem, offered an explanation for the decision that runs counter to the evidence before her, or offered an explanation that is so implausible that it cannot be ascribed to a difference in view or the product of her expertise in the application of Program provisions. *See, e.g., Motor Vehicle Manufacturers Association, Inc. v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (citations omitted). Similarly, the special master's findings and conclusions will be viewed as "an abuse of discretion" only if they are (1) clearly unreasonable, arbitrary or fanciful, (2) based on an erroneous conclusion of law, (3) clearly erroneous, or (4) without any rational basis in the record evidence. *Heat & Control, Inc. v. Hester Industries, Inc.,* 785 F.2d 1017, 1022 (Fed.Cir.1986) (citations omitted). Abuses of discretion under this definition are "unusual and exceptional." *Id.* Therefore, under the arbitrary, capricious, and abuse of discretion standard, it is not our function to determine whether we agree with the decision of the special master; rather, we are only required to determine whether her decision was based on irrelevant factors, whether it was without a rational basis, or whether it represents a clear error in judgment. *Cf. Bunge Corp. v. United States,* 5 Cl.Ct. 511, 522 (1984) (citations omitted), *aff'd,* 765 F.2d 162 (Fed. Cir.1985).

■■■ Accordingly, under the plain language of § 300aa–12(e)(2)(B), the case law interpreting and applying that standard, and the legislative admonishments of Congress,[9] we find that *both* the findings of fact and conclusions of law by Special Master Wright are entitled to *substantial* deference. Stated differently, both the findings and conclusions of the special master should not be overturned unless they are *truly* arbitrary, capricious, an abuse of discretion, or contrary to law. In this sense then, we may not reject findings of fact "if the evidence in the record has been considered, and if [that] evidence provides a *reasonable basis*" for those findings. *Munn v. Secretary of the Department of Health & Human Services,* 21 Cl.Ct. 345, 348 (1990) (citations omitted) (emphasis added). Similarly, mixed questions of law and fact, involving the application of the law to particular facts, may not be rejected if they are reasonably supported by the evidence and the law. *Id.* This standard is even more deferential than the clearly erroneous and substantial evidence standards. *Id.*

■■■ Perhaps most surprisingly, it appears that, in petitions under the Program, conclusions of law by the special master are also entitled to substantial deference. In this context, we observe that the Court of Appeals for the Federal Circuit (CAFC), in an analogous circumstance, has stated that:

This court will give substantial weight to the interpretation given a statute by ... [those] charged with its administration. [footnote citations omitted] This deference is particularly appropriate when "the administrative practice at stake 'involves a contemporaneous construction of a statute by ... [those] charged with the responsibility of setting its machinery in motion, of making the

---

**9.** The standard of review outlined in § 300aa–12(e)(2)(B) is a familiar one, and does not present any problems of ambiguity in its interpretation. Of course, where the meaning of a statute is plain on its face, we do not need to examine the legislative history. *Ocean Drilling & Exploration Co. v. United States,* 220 Ct.Cl. 395, 600 F.2d 1343 (1979). However, just be-

cause a statute has a plain meaning does not preclude an analysis of the legislative history if it provides additional guidance in construing and applying the statute. *Shimota v. United States,* 21 Cl.Ct. 510, 519 n. 22 (1990) (citation omitted). The legislative history at bar is critical to discerning the true intent of Congress, *supra.*

parts work efficiently and smoothly while they are yet untried and new.'" [footnote citations omitted] The ... construction of a statute should be followed unless there are compelling indications that it is wrong. [footnote citations omitted] The ... interpretation need not be the only reasonable construction, or the one the court would have adopted had the question arisen initially in a judicial proceeding; it just has to be a reasonable interpretation. [footnote citations omitted]

*Chula Vista City School District v. Bennett*, 824 F.2d 1573, 1579–1580 (Fed.Cir. 1987).

▮▮▮ Therefore, because the Office of the Special Masters is charged with the primary responsibility of developing and applying the subject novel Program provisions, a "decision on issues of law [by a special master] should be overturned *only when error is unmistakenly clear.*" *Munn*, 21 Cl.Ct. at 348 (emphasis added). *See also Hale v. Secretary of the Department of Health & Human Services*, 22 Cl.Ct. 403, 406 (1991); and *Hines*, 21 Cl.Ct. at 651 n. 11 (conclusions of law by the special master are entitled to "a significant amount of respect"). If the special master adopts an interpretation of a Program provision that has a reasonable basis on the law, that interpretation must be sustained even if there are other reasonable interpretations for that same provision. *Cf. S & G Excavating, Inc. v. United States*, 15 Cl. Ct. 157, 162 (1988) (citations omitted). Thus, against this background, we will not reject a conclusion of law by the special master unless it contravenes a statutory provision, clearly-discernable legislative intent, or is otherwise unreasonable or irrational. *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed.Cir.1986).

▮▮▮ While we must give substantial deference to the legal conclusions of the special master, that does not mean rubber stamp approval for conclusions that are inconsistent with Program provisions or frustrate the policy goals that Congress had in mind when it established a mechanism for compensating individuals with le-gitimate vaccine-related injuries. *See, e.g., NLRB v. Brown*, 380 U.S. 278, 291–292, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). We are not bound by the legal interpretations of the special master because, in the oft-quoted words of former Supreme Court Chief Justice John Marshall, "it is emphatically the province and duty of the judicial department to determine what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). *See Kinne v. United States*, 21 Cl.Ct. 104, 110 (1990) (the Claims Court "must interpret the law without deferring to other governmental officers [because] [t]he Constitution and laws of the United States charge the courts with the responsibility to discern the meaning of the law.... Congress ... may not ... abrogate the judicial branch's responsibility to interpret the law") (citations omitted).

▮▮▮ Therefore, under § 300aa–12(e)(2)(B) we are authorized to engage in a "thorough, probing, and in-depth" review, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), for the very limited purpose of determining whether the findings of fact or the conclusions of law by the special master are *truly* arbitrary, capricious, an abuse of discretion, or contrary to law. Under this standard, we are required to analyze the findings and conclusions of the special master to determine whether the decision was "based on a consideration of the relevant factors and whether there was a clear error of judgment." *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823 (citations omitted). This type of "rational decisionmaking" is the paramount touchstone of our review; if all of the relevant factors have been considered, there is a reasonable or rational basis for the findings, and there are no *clear errors*, the decision of the special master should be affirmed. *See, e.g., Hyundai Electronics Industries Co. Ltd v. United States International Trade Commission*, 899 F.2d 1204, 1209 (Fed.Cir.1990), *citing Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823. All that is really required is an articulation of a "rational connection between the facts found and the choices made." *Burlington*

*Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). We may not, under any circumstances, parse the record and substitute our own judgment for that of the special master as if we had decided the case *ab initio*. *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823. With these principles in mind, we now turn to the four primary issues raised by the respondent in its motion for review and memorandum of objections.

## DISCUSSION

### 1. *The $199,474.48 Lump Sum Award For Lost Wages*

██ The special master found that the petitioners are entitled to compensation under the rules outlined in § 300aa–15(a) generally, and for lost wages in particular under § 300aa–15(a)(3)(B). Together these sections provide, in relevant part, that:

(a) General Rule

*Compensation awarded under the Program* to a petitioner ... for a vaccine-related injury ... associated with the administration of a vaccine after the effective date of [the Program] *shall include* ...

 \* \* \* \* \* \*

(3) [Lost Earnings]

 \* \* \* \* \* \*

(B) In the case of any person who has sustained a vaccine-related injury before attaining the age of 18 and whose earning capacity is or has been impaired by reason of [that] vaccine-related injury ... and whose vaccine related injury is of sufficient severity to permit reasonable anticipation that such person is likely to suffer impaired earning capacity at 18 and beyond, compensation after attaining the age of 18 for loss of earnings determined on the basis of the average gross weekly earnings of workers in the private, non-farm sector, less appropriate taxes and the average cost of a health insurance policy, as determined by the Secretary.

(emphasis added).

Under this authority, the special master determined that Benjamin was entitled to $199,474.48 in compensation for lost earnings because the DPT vaccination clearly impaired his "earning capacity," *supra*, and because it was reasonable to anticipate that this impairment would continue beyond his 18th birthday.[10] SMD at 25. Pursuant to § 300aa–15(f)(4)(A), the special master ordered that said amount be included as part of the $733,532.52 lump sum award. Section 300aa–15(f)(4)(A) provides, in part, as follows:

(f) Payment of Compensation

 \* \* \* \* \* \*

(4)(A) ... *payment of compensation under the Program ... shall be paid from the trust fund in a lump sum of which all or a portion of the proceeds may be used as ordered by the special master to purchase an annuity* or otherwise be used, with the consent of the petitioner, in a manner determined by the special master to be in the best interests of the petitioner.

(emphasis added).

The respondent contends that § 300aa–15(a)(3)(B) *required* the special master to fund the $199,474.48 compensation award for "impaired earning capacity" through the purchase of an annuity, and that such lost earnings due to impaired earning capacity cannot be included as part of a direct lump sum award when the injured individual has not yet reached the age of 18. Similarly, it argues that the annuity should disburse compensation for lost wages due to impaired earning capacity only when, or if, Benjamin turns 18 years of age. In support of the foregoing, respondent cites

---

**10.** Because Benjamin was only two years old at the time of trial, the special master calculated the lost earnings over Benjamin's expected work life, beginning with his 18th birthday. This future anticipated loss of earnings amount due to impaired earning capacity was reduced to its net present value, as required by § 300aa– 15(f)(4)(A), which resulted in the $199,474.48 amount. The respondent does not contest this calculation or the amount of the award. It contests only the special master's decision to include it as part of the lump sum award rather than including it as an element to be covered by an annuity.

the legislative history of § 300aa–15(a)(3), which, in pertinent part, states that:

> Lost Earnings. In the case of an adult who sustains a vaccine injury and whose earning capacity is impaired by the injury, the level of compensation is to be determined in accordance with accepted actuarial principles. [*See* § 300aa–15(a)(3)(A) ].
>
> *In the case of a child who sustains a vaccine injury, compensation for lost earnings is to be made only after the child attains the age of 18.* At the age of 18, if the earning capacity of the injured person is determined to be impaired, the award is to be adjusted to include lost earnings up to the level of the average weekly earnings of workers in the private, non-farm sector, with appropriate, specified offsets.... [*See* § 300aa–15(a)(3)(B) ].

H.R.Rep. No. 99–908, 99th Cong., 1st Sess. at 21, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344, 6362 (emphasis added).

The special master specifically addressed and rejected these arguments for three reasons. First, she concluded that, because she had the power to order that all of the trust fund "proceeds" be paid immediately and directly to the petitioners in a lump sum on post-act petitions under § 300aa–15(f)(4)(A), Congress could not have meant to impose a restriction that would require the special master to fund an award for lost earnings due to "impaired earning capacity" *only* with an annuity. SMD at 25. Secondly, in a related argument, the special master pointed to former 42 U.S.C. § 300aa–15(f)(4)(A),[11] which provided for lump sum payments only and did not permit the use of annuities. She then contrasted that previous lump sum payment requirement with the language of § 300aa–15(a)(3)(B), which has never been amended since the Program was established. From this, Special Master Wright apparently determined that Congress did not mean to withhold the payment of compensation for impaired earning capacity (*i.e.*, lost earnings) until the age of 18 under the original legislation, and that it could not have meant to impose such a requirement when it subsequently amended § 300aa–15(f)(4)(A) to provide for the use of annuities. Thirdly, and finally, she concluded that the respondent's interpretation of § 300aa–15(a)(3)(A) would treat those individuals with the most severe injuries differently and unfairly because they might not live long enough to receive any compensation for their impaired "earning capacity" if they died before reaching the age of 18.

In view of this explanation, we cannot reverse the special master. The respondent's position has a modicum of appeal, nevertheless, the interpretation adopted by the special master is at least equally meritorious. Her interpretation has a reasonable basis in the law, and does not clearly contravene any plainly discernible legislative intent. This is particularly true in view of the explicit legislative history noting the creation of a "fair system ... [coupled] with certainty and generosity." Under these circumstances, it would be inappropriate to substitute our judgment for that of the special master. *See Chula Vista*, 824 F.2d at 1580 (the interpretation favored by the special master should be followed unless there are compelling indications that it is wrong; it should be followed if it is a reasonable interpretation) (citations omitted); *S & G Excavating*, 15 Cl. Ct. at 162 (a reasonable statutory interpretation by the special master will be sustained even though there are alternative explanations that might be just as reasonable) (citations omitted). That is to say, we feel compelled to affirm the special master on this issue because her interpretation of the relevant statutory provisions has some validity. While we probably would not have reached this result *ab initio*, we cannot say that her conclusions were "clearly mistaken." *See Munn*, 21 Cl.Ct. at 348.

We must affirm the special master primarily because her interpretation of

---

**11.** Former 42 U.S.C. § 300aa–15(f)(4)(A) (1988) provided, in part, that:

*[P]ayment of compensation under the Program shall be made in a lump sum* determined on the basis of the net present value of the elements of compensation.
(emphasis added).

§ 300aa–15(a)(3)(B) and § 300aa–15(f)(4)(A) results in the most harmonious construction of both provisions. This is a pure issue of statutory interpretation, and "the starting point in every case involving construction of a statute is the language of the statute itself." *Watt v. Alaska*, 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981), *cited with approval in Neptune Mutual Ass'n, Ltd. of Bermuda v. United States*, 862 F.2d 1546, 1549 (Fed.Cir.1988), and *Johns–Manville Corp. v. United States*, 855 F.2d 1556, 1559 (Fed.Cir.1988). Our analysis "begins and ends with the guiding principle that absent ambiguous language or clearly contrary legislative intent, a statute is construed in accord with its *plain meaning*." *E.g., Brown v. Secretary of the Department of Health and Human Services*, 920 F.2d 918, 920 (Fed. Cir.1990) (emphasis added) (citations omitted). "Clear evidence of legislative intent prevails over other principles of statutory construction," *see, e.g., Neptune Mutual*, 862 F.2d at 1549 (citations omitted), because it is presumed, and rightly so, that the plain meaning accurately expresses the legislative purpose. *See, e.g., Madison Galleries, Ltd. v. United States*, 870 F.2d 627, 632 (Fed.Cir.1989).

With these principles as our guide, we find that it is plainly evident that § 300aa–15(a)(3)(B) does not *require* the special master to order that compensation award proceeds for impaired earning capacity be used to purchase an annuity to the exclusion of an order directing that the award be paid in a lump sum. This is true because the general rule of compensability outlined in § 300aa–15(a), which encompasses the statutory authority for an award of lost earnings under § 300aa–15(a)(3)(B), governs only the types of available compensation for an injury. Section 300aa–15(a) does not in any way govern or explicate the disbursement of compensation awards under the Program.

Congress enacted specific provisions for that purpose, and those provisions governing the payment of compensation under the Program in post-act petitions are wholly contained in § 300aa–15(f)(4)(A). Under that paragraph, all compensation awards must initially be paid out of the *Program trust fund* in one lump sum. Thereafter, the special master has two basic options in controlling the use of these "proceeds." He or she may (i) order either party to use all or a portion of those "proceeds" to purchase an annuity or annuities, if that course of action is determined to be in the best interests of the injured individual, with or without the consent of the petitioners; [12] or (ii) order that those "proceeds" be used in some other manner deemed to be in the best interests of the injured individual, with the consent of the petitioners. The second option is very broad and embraces the authority to award a lump sum payment directly to the petitioners without further restriction, provided, of course, that a lump sum payment is deemed to be in the best interests of the injured individual and has received the blessings of both the special master and the petitioners. There is no statutory obligation upon the special master to order that those proceeds be used to purchase such an annuity, *Metzger v. Secretary of the Department of Health and Human Services*, 22 Cl.Ct. 123, 130 (1990), because the special master's exercise of discretion in this regard is limited only by the best interests of the injured child, whatever those interests may be, and "the consent of the petitioner." On this record, there is no indication that said lump sum payment is not in Benjamin's best interests, or that his parents are opposed to a lump sum payment.

In view of the latitude given to the special master in controlling the use of compensation award proceeds under § 300aa–15(f)(4)(A), we do not think that Special Master Wright acted arbitrarily, capriciously, with an abuse of discretion, or contrary to the law when she ordered the respondent to pay damages for lost earning ca-

---

12. *See, e.g., Loe v. Secretary of the Department of Health and Human Services*, 22 Cl.Ct. 430 (1991); *Huber v. Secretary of the Department of Health and Human Services*, 22 Cl.Ct. 255 (1991); *Ruben v. Secretary of the Department of Health and Human Services*, 22 Cl.Ct. 264 (1991).

pacity as part of the lump sum award. The special master's interpretation of the authority granted to her by § 300aa–15(f)(4)(A) was not "clearly mistaken," nor was it contrary to any *clearly* discernable legislative intent, *supra.* It is plainly evident that § 300aa–15(a)(3)(B) provides the special master with the authority to award compensation for impaired earning capacity measured by lost earnings, simply codifies the manner in which they must be calculated, and specifies only that they are to be *calculated* from the age of 18 if the individual suffered a vaccine-related injury before that time. Section 300aa–15(a)(3)(B) does not clearly or specifically require the special master to withhold an award for lost earnings until the injured individual reaches the age of 18. Similarly, it does not contain any clear indication that awards of lost earnings for impaired earning capacity are to be funded only by annuity. *See, e.g., Chula Vista,* 824 F.2d at 1580 (agency's construction of a statute should be followed unless there are compelling indications that it is wrong).

As the special master recognized, if § 300aa–15(a)(3)(B) were interpreted to mean that compensation for lost earnings could be provided only through the purchase of an annuity, that interpretation would run contrary to the discretion delegated to the special master in controlling the disbursement of Program proceeds under § 300aa–15(f)(4)(A). It is a well-settled principle of statutory construction that such absurd, conflicting results should be avoided. *See, e.g., Witco Chemical Corp. v. United States,* 742 F.2d 615, 619 (Fed. Cir.1984) (citations omitted). We must find that interpretation which can most fairly be said to be imbedded in both § 300aa–15(a)(3)(B) and § 300aa–15(f)(4)(A), and that

interpretation must be in harmony with the general scheme of the Program and the general purpose that Congress manifested in the legislation itself. *Id.* at 623 (citations omitted). Thus, while at first blush it seems incongruous to award compensation for earnings that will not be lost until sometime in the future, the interpretation adopted by the special master is, arguably, in greater harmony with all of the Program provisions and policy goals.

As we have demonstrated, the primary goal of § 300aa–15(a) in general, including § 300aa–15(a)(3)(B), is to describe the types of compensation available to an individual with vaccine-related injuries. The primary purpose of § 300aa–15(f)(4)(A) is to delineate the several methods by which that compensation may be paid or disbursed. The interpretation asserted by the respondent is not entirely harmonious with these goals because its restrictive construction of § 300aa–15(a)(3)(B) would preclude the special master from exercising the full range of discretion granted by the statutory authority of § 300aa–15(f)(4)(A), *see supra.* Moreover, the interpretation adopted by the special master gives the most consistent effect to the plain meaning evident in both § 300aa–15(a)(3)(B) and § 300aa–15(f)(4)(A) notwithstanding the legislative history underlying § 300aa–15(a)(3). The special master awarded and calculated lost earnings for impaired earning capacity under § 300aa–15(a)(3)(B), and then exercised her statutory discretion in directing the *manner* of payment under § 300aa–15(f)(4)(A), which is not restricted by the predecessor section. For all of the above reasons, we cannot truly say that the special master's interpretation of these two paragraphs was "clearly mistaken."[13]

13. There is another rational basis for adopting the interpretation embraced by the special master, one which was not cited in support of her conclusions. Under the plain language of § 300aa–15(a)(3)(B), one could sensibly argue that the vaccine-related injury being compensated is *loss of earning capacity, not loss of actual earnings.* Section 300aa–15(a)(3)(B) speaks in terms of compensation for impaired earning capacity resulting from a vaccine injury severe enough to impair earning capacity at age 18 and beyond. Thus, it would seem that the loss of

earning capacity could occur after the vaccination, but long before the injured child reaches the age of 18. The remainder of § 300aa–15(a)(3)(B) merely instructs the special master how to calculate the resulting damages stemming from that loss of earning capacity. In this context, therefore, an injured child should be able to receive immediate compensation for a loss (*i.e.,* "impaired earning capacity") that has already occurred. In fact, one could "generously" argue that such an individual would be un-

*See, e.g., Munn,* 21 Cl.Ct. at 348. Nor can we say that her interpretation was inconsistent with overall congressional policy to provide and award compensation "quickly, easily, and with certainty and generosity." *See* H.R.Cong.Rep. No. 99–908, 99th Cong., 1st Sess. at 3, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344.

### 2. The $250,000 Lump Sum Award For Pain And Suffering

Under § 300aa–15(a)(4), the special master may award up to $250,000 in compensation for actual and projected pain and suffering stemming from a vaccine-related injury. In this case, the special master determined that Benjamin was entitled to the full amount allowed under § 300aa–15(a)(4), and awarded $100,000 for actual and $150,000 for projected pain and suffering. Moreover, she directed the respondent to pay the entire $250,000 in a single lump sum award under § 300aa–15(f)(4)(A), without any present value adjustment. The respondent concedes that Benjamin is entitled to the $100,000 that the special master bestowed for actual pain and suffering, but both the respondent and this court raised questions regarding the propriety and the amount of the $150,000 award.

In this respect, the respondent argued first that Benjamin is not entitled to a compensation award for projected pain and suffering because his injuries are so severe that he will be incapable of experiencing conscious pain and suffering. Secondly, assuming that an award for future pain and suffering is warranted, it averred that Benjamin should be compensated with an annuity, not a lump sum payment, because periodic payments would help preserve limited Program funds for other individuals suffering from vaccine related injuries. In addition, during our initial review of these objections, we discovered that the special master did not reduce the $150,000 lump sum award for future pain and suffering to its net present value, as she was apparently required to do under § 300aa–15(f)(4)(A). Thus, we remanded the petition to the special master for further findings and conclusions. In her remand decision, the special

master concluded that the net present value provisions of § 300aa–15(f)(4)(A) should not be applied to the $150,000 award for future pain and suffering. For the following reasons, we reject the objections of the respondent, but conclude that the special master committed a clear and unequivocal error of law by concluding that an award for future pain and suffering should not be reduced to its net present value. We will examine the two objections raised by the respondent, and in turn, we will address the net present value issue presented by § 300aa–15(f)(4)(A).

■ The respondent contends that Benjamin is unable to experience any pain and suffering due to the severity of his initial vaccine related injury, and consequently, that he should not receive any award for future pain and suffering. This position is utterly without merit. Special Master Wright carefully reviewed the relevant record evidence and found that Benjamin is presently able to experience positive and negative feelings, and that it is likely that Benjamin will continue experiencing such feelings. SMD at 26–27. These findings are not only generally supported by the testimony of the petitioners' expert, but also the respondent's expert, a videotape of Benjamin, and the testimony of his parents. As such, they have a substantial and "reasonable basis" in the record, *see, e.g., Munn,* 21 Cl.Ct. at 348, and we cannot reject them simply because we might have made different findings on the same facts. *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823.

Moreover, we can find no probative countervailing evidence to support the respondent's position. Indeed, the respondent, while arguing that Benjamin does not and will not experience conscious pain and suffering, has completely failed to cite any evidence whatsoever in support of its bland assertions. Thus, it is plainly evident, and we so find, that the special master considered all of the evidence in the record, and that such evidence provides a reasonable basis for her ultimate decision. There-

equivocally entitled to immediate compensation

for such actual losses.

fore, we affirm the decision to award compensation for future pain and suffering.

■ Next, the respondent asserts that Special Master Wright abused her discretion in awarding the $150,000 as part of a lump sum instead of funding it through an annuity, which would purportedly preserve limited Program funds for distribution to other individuals suffering from vaccine related injuries. This argument also misses the mark. As we have already explained, to the extent that the special master or the parties wish to restrict the use of Program funds under § 300aa–15(f)(4)(A), they are bound only by the best interests of the injured individual. § 300aa–15(f)(4)(A) *does not* instruct the special master to consider what benefits, if any, an annuity award might have for the Program trust fund, nor is there any such suggestion in the legislative history. *See* H.R.Conf.Rep. No. 101–386, 101st Cong., 1st Sess. at 517, *reprinted in* 1989 U.S.Code Cong. & Admin.News 3120. There Congress stated that the amendment of § 300aa–15(f)(4)(A) was intended to show "that in any awards the special master may order the purchase of an annuity or use awarded compensation in a manner determined to be in the best interests of the petitioner." To reiterate, the special master is not in any way *required* to enter an order directing that the proceeds be used to purchase an annuity. *Metzger,* 22 Cl.Ct. at 130. Thus, it is clear that the special master here acted in full accord with the law when she decided on this record to order the respondent to pay the pain and suffering award as part of the lump sum award.

■ We now turn to the issue of— whether a lump sum award for future pain and suffering under § 300aa–15(a)(4) must be reduced to its net present value under § 300aa–15(f)(4)(A). The special master implicitly concedes that the statutory language contained in § 300aa–(f)(4)(A) appears to require a net present value reduction for all elements of compensation, in-

cluding lump sum awards for future pain and suffering. Nevertheless, she concludes that this interpretation would produce results at odds with accepted practice in other circuits, would run counter to the legislative history for the net present value provisions in § 300aa–15(f)(4)(A), and would produce an illogical and capricious outcome. After analyzing each of these asserted bases, we conclude that the special master erred in her interpretation of § 300aa–15(f)(4)(A), and that the $150,000 lump sum award for future pain and suffering must be reduced to its net present value. Thus, the petitioners are entitled to receive a lump sum award of $100,242.02 for future pain and suffering (rather than $150,000), and a total lump sum cash award of $683,774.54.[14]

■ Our conclusion is premised on simple principles of statutory construction, which bear repeating here. It is absolutely fundamental that the interpretation of every statute must be based on the language of the statute itself. *Watt* 451 U.S. at 265, 101 S.Ct. at 1677. We are bound by "the guiding principle that absent ambiguous language or clearly contrary legislative intent, a statute is construed in accord with its plain meaning." *Brown,* 920 F.2d at 920. "Clear evidence of legislative intent prevails over other principles of statutory construction," *Neptune Mutual,* 862 F.2d at 1569, and that clear evidence is most likely expressed by the plain meaning contained in the statutory language. *Madison Galleries,* 870 F.2d at 632.

■ Statutes should be construed in a way that does not produce absurd results, *Witco,* 742 F.2d at 619. In addition, a court may, under very limited circumstances, ignore the statutory language where the clear congressional intent as reflected in the legislative history is thwarted by a literal application of that language. *Conlon v. United States,* 8 Cl.Ct. 30, 33 (1985), *citing Helvering v. New York Trust*

---

**14.** The special master, although reaching a contrary legal conclusion, determined that Benjamin has a thirty-two year life expectancy, that 3% is a reasonable net discount rate, which results in the $100,242.02 net present value fig-

ure for projected pain and suffering instead of the $150,000 initially awarded. When the original $733,532.52 cash award is adjusted to reflect this new figure, the petitioners are now entitled to receive $683,774.54.

*Co.*, 292 U.S. 455, 464–465, 54 S.Ct. 806, 808–809, 78 L.Ed. 1361 (1934); *Holy Trinity Church v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892); *Ocean Drilling v. United States*, 220 Ct. Cl. 395, 402–403, 600 F.2d 1343, 1347 (1979). However, this rule of construction is to be applied *only* in extraordinary conditions. In other words, it is unnecessary to look beyond the statute if it is clear on its face. To prove a legislative intent contrary to that expressed in the statute, there must be a clear, unequivocal, and unambiguous showing to that effect in the legislative history. *E.g., Brown*, 920 F.2d at 920. *See also Conlon*, 8 Cl.Ct. at 33, *citing Tennessee Valley Authority v. Hall*, 437 U.S. 153, 187, n. 33, 98 S.Ct. 2279, 2298, n. 33, 57 L.Ed.2d 117; *Hart v. United States*, 218 Ct.Cl. 212, 226, 585 F.2d 1025, 1033 (1978).

Given these established principles of statutory construction, we have no choice but to reverse the special master because she has not cited, and we have not located, any clear indication of a legislative intent contrary to that statutorily expressed by Congress when it enacted § 300aa–15(f)(4)(A). In relevant part, that section states that:

> [the] payment of compensation under the Program *shall* be determined on the basis of the net present value of the elements of compensation....

(emphasis added).

This language is crystal clear. It is susceptible to only one interpretation, and it unequivocally and without reservation instructs the special master to determine the amount of lump sum compensation on the basis of net present value. § 300aa–15(a)(4) lists future pain and suffering as an element of permissible compensation under the Program, and as such, is subject to the net present value restrictions imposed by § 300aa–15(f)(4)(A). Therefore, we find that projected pain and suffering must be reduced to its net present value if that element of compensation is awarded as

part of a lump sum. No other conclusion is permissible.

The countervailing arguments raised by the special master are not persuasive, and do not outweigh the plain meaning of the statutory language. Thus, it is of no consequence whatsoever that the reduction of an award for future pain and suffering is contrary to the rule of law in a number of the federal circuit courts.[15] That rule is premised on traditional common law tort principles; it does not bear any relationship to the explicit statutory language contained in the Program provisions before us. Therefore, this rule has no application here, and does not remove future pain and suffering awards under the Program from the operation of § 300aa–15(f)(4)(A).

Next, the special master determined that the clear statutory language requiring the reduction of all elements of lump sum compensation should not be applied to awards for future pain and suffering because it would purportedly be contrary to the legislative history contained in H.R. Rep. No. 100–391, 100th Cong., 1st Sess. 697, *reprinted in* 1987 U.S.Code Cong. & Admin.News, 2313–1, 2313–371. This report states that:

> [As previously codified, the Program provided] for lump-sum payment of compensation awards.... The [currently codified] legislation revises this payment schedule to provide that the entire award for prospective cases be made in a single lump sum, with anticipated future *expenses* discounted to their net present value.

(emphasis added).

From the foregoing, the special master concluded that Congress meant to reduce only future "expenses," and that pain and suffering is not a future "expense." According to *Black's Law Dictionary* 687 (4th ed. 1968), an expense is "that which is expended, laid out or consumed; an outlay; charge; cost; price." On the other hand, the special master asserts that pain and

---

**15.** For this proposition, the special master cites *Taylor v. Denver & Rio Grande Western Railroad Co.*, 438 F.2d 351, 353 (10th Cir.1971); *United States v. Harue Hayashi*, 282 F.2d 599, 606 (9th Cir.1960); *Texas and Pacific Railway*

*Co. v. Buckles*, 232 F.2d 257, 254 (5th Cir.1956), *cert. denied*, 351 U.S. 984, 76 S.Ct. 1052, 100 L.Ed. 1498; *Chicago & N.W. Railway v. Candler*, 283 F. 881, 885 (8th Cir.1922).

suffering is an intangible, abstract concept which eludes a precise mathematical calculation. While we do not necessarily disagree with this distinction between an expense and pain and suffering, there can be no doubt that this is an esoterical and overly-technical distinction. It is not the sort of clear, unequivocal, and unambiguous expression of contrary legislative intent that is required before we can ignore the plain and unambiguous statutory language at issue here. *See Brown*, 920 F.2d at 920. § 300aa–15(f)(4)(A) applies to all elements of *compensation*, and future pain and suffering is plainly included in this category under § 300aa–15(a)(4). Stated simply, in contrast to the assertions by the special master, we conclude that the legislative history simply does not show a legislative intent clearly at odds with the intent expressed in § 300aa–15(f)(4)(A).

Finally, the special master states that a literal application of the relevant statutory provisions here would produce "an illogical and capricious result," apparently because the net present value of projected pain and suffering would be difficult to calculate. We fail to see the merit of this argument. Congress decided to place a cap on the amount of compensation available for all pain and suffering, and it further decided to require a net present value reduction for projected pain and suffering. One might argue, as the special master does, that it is impossible to make a rational determination on the present value of future pain and suffering, but Congress obviously believes otherwise and we are not in a position to judge the wisdom of its decisions. Indeed, the inconsistency in the special master's argument is highlighted by the mere fact that she was able to make these calculations.[16] For all of these reasons then, we

reverse the special master on this single issue, and find that the $150,000 lump sum award for future pain and suffering must be reduced to its net present value of $100,242.02.

### 3. *The $48,626.05 Lump Sum Award For Architectural Modifications*

Both the petitioners and the respondent agreed that some home modifications were necessary to accommodate Benjamin's needs during the extended time that he will be living with his parents. Thus, the parties have stipulated that since the family home will need to be immediately modified to accommodate Benjamin's condition, and the average family has a change of residence every seven years (U.S. Department of Labor statistics), two additional home modifications will be required when Benjamin reaches nine years of age (1997) and one when he reaches 16 years of age (2004), at a cost of $18,500 each. The special master reduced this award to its net present value under § 300aa–15(f)(4)(A), and included it among the elements of compensation that were awarded in the lump sum. The respondent argues, however, that there is no reason to award all of the compensation for home modifications in a lump sum, and contends that the second and third renovations should be covered by an annuity that will make payments in the seventh and 14th years.

As we have clearly established, the only factor limiting the special master's discretion in controlling the use of award proceeds under § 300aa–15(f)(4)(A) is the best interests of the petitioner, and there is no statutory obligation that the compensation for this element be funded through the

---

**16.** In this regard, the special master also claims that Benjamin is entitled to the full $150,000 for future pain and suffering because she would have awarded $500,000 in the absence of the statutory cap, and that the net present value of this figure is still in excess of $150,000. This argument has no merit because the special master is allowed to award *no more than $250,000* in compensation for pain and suffering in any event under § 300aa–15(a)(4), and it is that element of compensation that is subject to the net present value reduction in § 300aa–15(f)(4)(A).

In addition, the special master contends that, if the future pain and suffering element of compensation must be reduced to its net present value, the $33,451.99 award for past unreimbursable expenses should be increased to $36,128.15 to reflect its current net present value. This finding exceeds the scope of the remand order, but we nevertheless think it is clear that § 300aa–15(f)(4)(A) applies only to future compensation and not compensation for past expenses.

purchase of an annuity. *Metzger*, 22 Cl.Ct. at 130. Here, the special master apparently decided that a lump sum award for home modifications, discounted to its net present value, would be in Benjamin's best interests because she could not predict when the Stotts might move. SMD at 22, note 45. This is a rational explanation for the special master's decision to include this element of compensation in the lump sum award, and for that reason, we cannot revise that decision by substituting our own and direct that this part of the award be funded by an annuity. Consequently, we find that the respondent's assertions in this regard are without credible support in the record, and additionally, they are not well grounded in the law.

4. *The Award Of Compensation For Special Education and Special Therapy Services Without EAHCA Offsets*

 The special master awarded a substantial amount of compensation for special education and therapy services, SMD at 15–17, which will be funded through the purchase of an annuity, SMD at 29, 30–32. As we understand it, the respondent argues that this aspect of the decision was arbitrary, capricious, an abuse of discretion, or contrary to law because the special master failed to offset this award to account for services that the petitioners will purportedly receive free of charge under the EAHCA. *See* 20 U.S.C. §§ 1400 *et seq.* That is, the respondent contends that, under the provisions of § 300aa–15(g), the special master was obligated to offset the value of services that the public school system is supposedly required to furnish to petitioners under the EAHCA against the amount awarded to compensate the petitioners for the projected day care costs of special education and therapy services.

The respondent relies on two provisions in the EAHCA, which provide, in relevant part:

§ 1400. Congressional statements and declarations

\* \* \* \* \* \*

(c) Purpose

It is the purpose of this chapter to assure that all handicapped children *have avail-*

*able to them … a free public education which emphasizes special education and related services designed to meet their unique needs,* to assure that the rights of handicapped children and their parents or guardians are protected, to assist States and localities to provide for the education of all handicapped children, and to assess and assure the effectiveness of efforts to educate handicapped children.

§ 1401. Definitions

(a) As used in this chapter—

\* \* \* \* \* \*

(17) The term *"related services "* [in § 1400(c)] *means transportation, and such developmental, corrective, and other supportive services* (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) *as may be required to assist a handicapped child to benefit from special education …*

(emphasis added).

The respondent next points to § 300aa–15(g), which states, in pertinent part, as follows:

(g) Program not primarily liable

*Payment of compensation under the Program shall not be made for any item or service to the extent that payment has been made, or [to the extent that payment] can reasonably be expected to be made, with respect to such item or service* (1) under any State compensation program, under an insurance policy, or any other Federal or State health benefits program … or (2) by an entity which provides health services on a prepaid basis.

(emphasis added).

Our analysis of respondent's position compels us to conclude that it has again missed the mark, and, therefore, we find no basis to reverse the decision of the special master. The respondent correctly observes that Congress intended the Program to be a secondary source of compensation for

vaccine-related injuries. However, it errs by asserting that the special master was obligated to offset the supposed benefits available under the EAHCA because, under the plain meaning of § 300aa–15(g), the special master needs to reduce an award only if there has been *actual* payment, or if the special master can reasonably anticipate that there will be an actual payment for the vaccine injuries being compensated with an award from Program funds. Congress, in its wisdom, made an unambiguous choice of words, leaving little room for hospitable interpretations. In focusing on the operative language, *supra*, "[i]t is axiomatic that 'the starting point for interpreting a statute is the language of the statute itself,' and that 'absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'" *Ulmet v. United States*, 822 F.2d 1079, 1082 (Fed.Cir.1987) (citation omitted). The EAHCA does not facially in any way provide for the *payment* of any compensation or the reimbursement of any vaccine-related expense, past, present, or future. To the contrary, the EAHCA requires only that special education and related services be made *available* in public school systems around the country for those handicapped children with unique educational needs. No payments are involved, and the parents of handicapped children are not compelled to avail themselves of the benefits provided under the EAHCA. On this record, therefore, respondent has not shown that the special master failed to account for any payments that the petitioners might reasonably be expected to recover under the EAHCA. Thus, we find that the special master did not err as a matter of law in her interpretation and application of § 300aa–15(g).

Against this background, therefore, we need only determine whether the special master acted arbitrarily, capriciously, or with an abuse of discretion and contrary to law in deciding that the services allegedly available through the public school system would be insufficient to meet Benjamin's needs under the Program. We observe, regarding the foregoing, that the petitioners requested compensation for a wide range of special educational and therapeutic services. When the respondent's own expert witnesses suggested that Benjamin would benefit most if he were to remain living at home, making regular visits to a day care program with the ability to handle his particular needs, the special master permitted the parties to make submissions further exploring this option. SMD at 15. Following thereon, the respondent argued that, once he became eligible, Benjamin could be adequately served through the California public school and special education system, while the petitioners vigorously asserted that these programs could not and would not provide Benjamin with the individual therapies that he will require.

The special master agreed with the petitioners' contentions, and found that the *public* special education programs were geared towards handicapped children with far greater potential for intellectual function and less significant physical impairments than those of the injured petitioner here. Further, the special master noted the *advantages* of the day care treatment proposed by the petitioners: (i) it is specifically designed to assist children, like Benjamin, with traumatic brain injuries, neurological damage, developmental disabilities, and emotional and behavioral disorders; (ii) it is designed to provide the type of aggressive and continuing therapy needs that Benjamin will require throughout his life; (iii) it is flexible enough to accommodate Benjamin's changing needs; and (iv) it will remove the need to provide the same services through a patchwork of different specialists. In addition, Special Master Wright noted that the respondent failed to adduce evidence showing that the services provided by the public school system would adequately meet the tremendous needs present in this case. In this connection, we observe that the public system provides that— "medical services shall be for diagnostic and evaluation purposes only." For all of these reasons, she rejected the respondent's assertions, and we find that this decision is reasonably supported by the record. *See, e.g., Munn*, 21 Cl.Ct. at 348.

## CONCLUSION

The decision of Special Master Wright is, therefore, AFFIRMED IN PART and REVERSED IN PART. The Clerk of the Court shall enter judgment accordingly. No costs.

IT IS SO ORDERED.