**Jeffrey DILEO, an infant by his guardian ad litem, Virginia DILEO, Petitioner,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

**No. 90–363V.**

United States Claims Court.

Aug. 23, 1991.

George A. Mauro, Somerville, N.J., for petitioner.

Gerard W. Fischer, Washington, D.C., for respondent.

## OPINION

MARGOLIS, Judge.

This vaccine case comes before the court on a motion to review filed by the petitioner, Jeffrey DiLeo, on April 25, 1991, pursuant to Appendix J, RUSCC. DiLeo brought an action seeking compensation under the National Vaccine Injury Compensation Program, *codified as amended* at 42 U.S.C.A. §§ 300aa–10 *et seq.* (West Supp.1991) ("the Program"), for a condition he alleges resulted from a diphtheria-pertussis-tetanus ("DPT") vaccination received as a child. Special Master Denis Hauptly held evidentiary hearings in Newark, New Jersey on January 7, 1991 and in Arlington, Virginia on January 31, 1991. On March 28, 1991, the Special Master rendered a decision denying compensation to DiLeo on the ground that he failed to establish an ontable injury by a preponderance of the evidence. *DiLeo v. Secretary of the Department of Health and Human Services,* No. 90–363V, slip op. at 8–9, 1991 WL 57050 (Cl.Ct. March 28, 1991) (decision of Special Master).

After a careful review of the Special Master's decision and the entire record, and after hearing oral argument, this court holds that the decision is not in accordance with law and fails to consider the relevant factors. The case is remanded back to the Special Master for further action in accordance with this opinion. *See* 42 U.S.C.A. § 300aa–12(e)(2)(C); Appendix J, RUSCC.

## FACTS

The parties do not dispute the essential facts of the case as found by the Special Master. *See DiLeo,* slip op. at 5–6. DiLeo received his first DPT vaccination on June 2, 1981, to which there was no memorable reaction. On August 13, 1981, petitioner's mother complained to his pediatrician, Dr. John B. Lewy, that petitioner slept too much and choked while nursing. The doctor noted a slight head lag, but otherwise found the petitioner to be developmentally normal. At the mother's urging, the doctor recommended an infant stimulation program. The second DPT shot was administered in the late afternoon of August 13, 1981. *Id.* at 5.

The petitioner whimpered, acted irritable, refused to nurse and cried differently in the hours following the shot. He ran a fever and appeared flushed. During the evening he was left in the care of his maternal grandmother, who is a registered nurse with experience working with neurologically impaired, emotionally disturbed, and physically handicapped children. Petitioner's temperature rose to over 105 degrees Fahrenheit, and his parents returned home upon learning that he had become worse. *Id.*

On August 16, 1981, the family travelled to Washington, D.C. During the trip, the petitioner ran a lower fever and mostly slept, and consequently did not nurse as much as usual. In a restaurant during dinner, the petitioner at one point sat motionless and stared, with a tightened or rigid appearance. This episode is subsequently referred to as the "first staring spell." The petitioner had another staring spell at a photography session during the next week. Dr. Lewy's office was not contacted about the staring spells, but his office was called because petitioner was screaming and unconsolable. Medical records reveal a prescription for colic on September 3, 1981. *Id.* at 5–6.

Later in September, petitioner was examined by a team of therapists evaluating his condition for the infant stimulation program. He was floppy, could not support himself, and did not react to sounds. The petitioner was sent back to his pediatrician. Alarmed at the regression, Dr. Lewy referred the petitioner to a pediatric neurologist, Dr. Sandy P. Waran, who hospitalized

the petitioner. An abnormal electroenceph-alogram showed the petitioner was suffer-ing myoclonic seizures, which were not breaking through at the time, but did so later. DiLeo claims that he suffered se-vere adverse reactions to the second DPT vaccination within 72 hours of its adminis-tration on August 13, 1981. As a result, DiLeo asserts that he showed profound signs of developmental regression, which have developed into mental retardation, en-cephalopathy, myoclonic seizures, develop-mental delay and infantile spasms. The record reveals that petitioner suffers from reoccurring seizures almost daily and that, at age 10, is not able, and has never been able, to care for himself.

## DISCUSSION

*Statutory Scheme*

■ The Program provides that compen-sation may be awarded where the petition-er establishes by a preponderance of the evidence the occurrence of a statutorily-described injury listed on the Vaccine Inju-ry Table within a statutorily-defined time period. 42 U.S.C.A. § 300aa–14.[1] In "Ta-ble" cases, temporal association as defined by statute demonstrates causation, because listing on the Vaccine Injury Table signifies that a listed injury occurring within a listed period of time after the administration of a listed vaccine will be deemed to have been caused by that listed vaccine. *See Carter v. Secretary of the Department of Health and Human Services*, 21 Cl.Ct. 651, 654 (1990). If the petitioner satisfies the threshold burden, as well as jurisdictional requirements, compensation shall be awarded if no preponderance of the evi-dence shows "factors unrelated to the ad-ministration of the vaccine" caused the in-jury or death. 42 U.S.C.A. § 300aa–13(a). In our case, petitioner seeks compensation based upon a "Table" theory. The DPT vaccine is listed on the Vaccine Injury Ta-ble. On appeal to this court, petitioner advances two theories of on-table injury: residual seizure disorder and encephalopa-thy.[2]

Residual seizure disorder is included on the Table among the injuries listed under the DPT vaccine. *Id.* § 300aa–14(a)(1)(D). The provision setting forth "qualifications and aids to interpretation" states that:

... [a] petitioner may be considered to have suffered a residual seizure disorder if the petitioner did not suffer a seizure or convulsion unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit before the first sei-zure or convulsion after the administra-tion of the vaccine and if—

\*    \*    \*    \*    \*    \*

(B) in the case of [the DPT] vaccine, the first seizure or convulsion occurred within 3 days after administration of the vaccine and 2 or more seizures or convulsions occurred within 1 year af-ter the administration of the vaccine which were unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit.

*Id.* § 300aa–14(b)(2).

Encephalopathy is defined as "any signif-icant acquired abnormality of, or injury to, or impairment of function of the brain." *Id.* § 300aa–14(b)(3)(A). The qualifications and aids to interpretation further states:

... [a]mong the frequent manifestations of encephalopathy are focal and diffuse neurologic signs, increased intracranial pressure, or changes lasting at least 6 hours in level of consciousness, with or without convulsions. The neurological signs and symptoms of encephalopathy may be temporary with complete recov-ery, or may result in various degrees of permanent impairment. Signs and symp-toms such as high-pitched and unusual

---

**1.** Alternatively, compensation may be awarded when the petitioner proves actual causation by showing a medical theory causally connecting the vaccination and the non-Table injury. 42 U.S.C.A. § 300aa–11(c)(1)(C)(ii).

**2.** The Program also allows two other theories of compensation for DPT-related injury: anaphy-laxis and hypotonic-hyporesponsive collapse. 42 U.S.C.A. § 300aa–14(a)(1)(A), (C); *see DiLeo*, slip op. at 3 n. 1. Although petitioner's expert opined that the petitioner suffered hypotonic-hyporesponsive collapse, petitioner does not ar-gue this theory on appeal.

screaming, persistent unconsolable crying, and bulging fontanel are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy. Encephalopathy usually can be documented by slow wave activity on an electroencephalogram.

*Id.* For both theories, "the terms 'seizure' and 'convulsion': include grand mal, petit mal, absence, myoclonic, tonic-clonic, and focal motor seizures and signs." *Id.* § 300aa–14(b)(4).

### Special Master's Decision

The Program requires that in order to establish an on-table injury the petitioner must show evidence of suffering "the first symptom or manifestation of onset or of the significant aggravation" of an injury within the time frame indicated on the Table. *Id.* § 300aa–14(a). For both residual seizure disorder and encephalopathy, the time frame is three days. *Id.* § 300aa–14(a)(1)(B), (D). Although the Special Master commented that evidence of when the first staring spell occurred was "murky," he assumed that it took place within three days after the administration of the DPT vaccine. *DiLeo,* slip op. at 6–7.

The crux of the Special Master's decision is that DiLeo failed to establish by a preponderance of the evidence that the first staring spell was a seizure. *Id.* at 7. The Special Master relied on the testimony of the respondent's expert, Dr. Guggenheim, who is a board-certified specialist in pediatrics and pediatric neurology and has a clinical practice in pediatric neurology. The Special Master summarized her testimony as follows:

> She testified that a staring spell means that the child is not responding normally to the surroundings and that it does *not* mean abnormal motor activity. She believes a staring spell is not a seizure. Staring spells are unusual both at this age and as the first sign of complex neurologic disease. Dr. Guggenheim has never read in the literature of a staring spell as a DPT reaction.

*Id.* (citations omitted). On the other hand, the Special Master noted that Dr. Geier,

the petitioner's medical expert, did not unambiguously assert that the first staring spell was a seizure, although the Special Master found that Dr. Geier partially based his opinion on the assumption that it was a seizure. The Special Master stated that "[e]ven if his opinion was clear, I would give greater weight to Dr. Guggenheim's conclusions as a pediatric neurologist. Consequently, no preponderance of the evidence demonstrates that the petitioner's staring spell was a seizure. Without a seizure, the reaction Jeffrey DiLeo suffered within three days of his second DPT vaccination does not qualify under either theory, residual seizure disorder or encephalopathy, as an on-table case." *Id.* at 7–8.

### Standard of Review

■ The Special Master's decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C.A. § 300aa–12(e)(2)(B). The reviewing court should not substitute its judgment for that of the decision maker. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The touchstone is rationality: if the relevant factors have been considered and no clear error of judgment has been made, the decision should be affirmed. *Hyundai Electronics Industries v. United States International Trade Commission,* 899 F.2d 1204, 1209 (Fed.Cir.1990); *see also Stotts v. Secretary of the Department of Health and Human Services,* 23 Cl.Ct. 352, 358–362 (1991) (discussing in detail the applicable standard of review). This court reviews the Special Master's decision accordingly.

### Review of Special Master's Decision

DiLeo contends that the Special Master's decision denying compensation was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. DiLeo objects to the Special Master's reliance on the opinion of Dr. Guggenheim that a staring spell, in general, is not a seizure. According to DiLeo, because subsequent evidence of abnormal brain func-

tioning and numerous seizures indicate that the staring spell was a seizure, the Special Master placed undue weight on Dr. Guggenheim's opinion. Petitioner additionally argues that Dr. Guggenheim was unsure that staring spells are not seizures and that her explanation that staring spells indicate a temporary disorientation with the environment is not consistent with the rigid, motionless incident that lasted minutes. The petitioner asserts that the Special Master's conclusion that the first staring spell was not a seizure is inconsistent with the results of subsequent medical tests indicating ongoing myoclonic seizures which were not fully recognizable by observing the child.

Instead, DiLeo argues that the Special Master should have relied on the testimony of Dr. Geier who concluded that all of the facts, including tests revealing subsequent neurological problems, blended together to lead to the conclusion that the first staring spell was a seizure. Petitioner also points to the eyewitness accounts of the mother and father, as well as the grandmother, a nurse and "professionally experienced observer" who feared that the staring spell was a petit mal seizure. In summary, petitioner argues that he proved manifestation within the three-day period by a preponderance of the evidence and that the Special Master's failure to so find was a clear error in judgment and not rational.

■ The Special Master's finding that DiLeo failed to establish that the first staring spell was a seizure is the foundation upon which his decision was based. *DiLeo,* slip op. at 7. From there, the Special Master reasoned that, "without a seizure, the reaction Jeffrey DiLeo suffered within three days of his second DPT vaccination does not qualify under either theory, residual seizure disorder or encephalopathy, as an on-table case." *Id.* at 7–8. The problem with this logic is that the statute does not specify that a seizure is the only indication

that will demonstrate that the petitioner suffered an encephalopathy. The qualifications and aids to interpretation states that "[a]mong the frequent manifestations of encephalopathy are focal and diffuse neurologic signs, increased intracranial pressure, or changes lasting at least 6 hours in level of consciousness, *with or without* convulsions." 42 U.S.C.A. § 300aa–14(b)(3)(A) (emphasis added). There is no requirement that DiLeo prove he suffered a seizure in order to demonstrate that he suffered an encephalopathy. Therefore, the premise of the Special Master's decision, that petitioner was required to show that he suffered a seizure, is an error of law.

■ Owing to the focus on whether the first staring spell was a seizure, the Special Master did not appear to consider directly the question of whether the first staring spell was a manifestation of an encephalopathy. This is the critical question in our case. As a result, the Special Master did not consider relevant factors in determining whether the petitioner suffered an encephalopathy. The Special Master failed to confront, for example, whether the first staring spell was a neurologic sign indicating an encephalopathy. Given the strong lay witness testimony in the record concerning the serious and strange nature of the first staring spell, even if it was not a seizure, and the subsequent medical evidence[3] showing abnormal brain activity and rapid deterioration in DiLeo's condition, it is especially important that the Special Master carefully consider the evidence in light of all of the relevant factors. While the Special Master is afforded wide latitude in weighing the evidence in the record, *Munn v. Secretary of the Department of Health and Human Services,* 21 Cl.Ct. 345, 350 (1990), the standard of review requires that the Special Master's decision be "in accordance with law" and that the relevant factors be considered. 42

---

3. *See* 42 U.S.C.A. § 300aa–13(b)(1) (stating that "the special master or court shall consider, in addition to all other relevant medical and scientific evidence contained in the record—(A) any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death and (B) the results of any diagnostic or evaluative test which are contained in the record and summaries and conclusions.").

U.S.C.A. § 300aa–12(e)(2)(B); *Hyundai Electronics Industries*, 899 F.2d at 1209.

## CONCLUSION

The Special Master's decision is not in accordance with law and fails to consider the relevant factors in assessing whether petitioner is entitled to compensation. Therefore, this court remands the case back to the Special Master for proceedings in accordance with this opinion.